# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-38

**LAURA KAYE LANDSBURG STEINEBACH**

**VERSUS**

**WILLIAM JACOB STEINEBACH, IV**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 72,907, DIV. B
HONORABLE JOHN C. FORD, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

**AFFIRMED.**

Elvin Clemence Fontenot, Jr.
110 East Texas Street
Leesville, LA 71446
Telephone: (337) 239-2684
COUNSEL FOR:
    Plaintiff/Appellant - Laura Kaye Landsburg Steinebach

Charles Overton LaCroix
LaCroix, Levy & Barnett
P. O. Box 1105
Alexandria, LA 71309-1105
Telephone: (318) 443-7615
COUNSEL FOR:
    Defendant/Appellee - William Jacob Steinebach, IV

**THIBODEAUX, Chief Judge.**

This case involves custody, visitation, and child support issues between the plaintiff-appellant, Laura Steinebach (now Clark) and the defendant-appellee, William Steinebach, IV. Following a five-day trial in 2005, the trial court issued a judgment awarding joint custody of the minor child to both parties, with domiciliary custody in favor of Laura and visitation in favor of William. The judgment ordered William to pay child support in the amount of $100.00 per month. Pursuant to motions for a new trial filed by both parties, the trial court modified the child support award by ordering William to also pay travel expenses associated with out-of-state visitation, but awarded him the use of the tax credit for dependent children. Both parties appealed. For the following reasons, we affirm the judgment of the trial court.

I.

**ISSUES**

We must decide:

(1)     whether the trial court abused its discretion in awarding domiciliary custody to Laura Steinebach, and in denying a new trial to William on this issue;

(2)     whether the trial court abused its discretion in the amount of visitation awarded to William Steinebach;

(3)     whether the trial court erred in determining the child support obligation of William Steinebach; and

(4)     whether the trial court erred in awarding the federal tax credit to William Steinebach.

II.

**FACTS AND PROCEDURAL HISTORY**

Laura and William Steinebach met in November of 2001 in Germany, where William was stationed with the Air Force, and where Laura was stationed with her first husband, whom she was in the process of divorcing. Laura and William

returned to the United States in 2002, lived together for awhile, and were married in DeRidder, Louisiana, in May of 2003. William was still in the Air Force and stationed at Fort Polk, which is an Army base that also houses Air Force personnel. The marriage was difficult from the beginning, as both parties had somewhat volatile tempers, and the couple fought bitterly on their wedding day. Six months later, in November 2003, a son was born to Laura and William. Difficulties escalated into a physical altercation in January of 2004, and, after efforts at reconciliation failed, the couple separated in June of 2004. Laura filed for divorce in Vernon Parish less than three weeks later, and apparently William also attempted to file at the same time in Florida while visiting his parents. The divorce was final in June of 2005.

As part of the divorce proceedings, the couple worked out an equal sharing custody arrangement wherein they each cared for the child every other week. Laura continued to live in the government housing unit they had shared, while William moved to the barracks, then a hotel, then an apartment, in order to share custody of the child. During the separation, the parties accused each other of alcohol abuse and child neglect and involved the Air Force and various child protection services in their ongoing battles. However, no neglect was found. Laura also made accusations of non-support, as the only cash that she received from William, up until the January 2006 judgment, was one payment of $100.00 which he made in July of 2004 shortly after their separation. William was ordered to take food and diapers to Laura on a few occasions, which the Air Force considered "support in kind." Laura is hearing impaired, and, as she was not employed, except briefly at the beginning of the pregnancy, the only income she had was her disability benefit of $423.00 per month. Both parties received assistance from both sets of grandparents as a result of the economic problems that the couple had during and after the marriage.

In November of 2004, the court appointed Dr. John C. Simoneaux to evaluate the parties and make recommendations regarding custody. Dr. Simoneaux opined that both parents appeared capable of providing the child with love and care but pointed out that both are dependent on their own parents, and stated that it was hard for him to make recommendations without talking to the grandparents as well. Notwithstanding, he ultimately recommended William as being the more stable of the two based upon psychological testing.

At the end of December 2004, William obtained a discharge from the Air Force and moved to Florida where his parents lived. Laura left the government housing unit, obtained an apartment and remained in Louisiana. In January 2005, these parents entered into an equal sharing arrangement wherein the child stayed for three weeks with each parent. William was ordered to pay the transportation costs associated with the exchange, pending the custody and child support hearing scheduled for April 2005. However, there was no interim support established.

After a hotly contested trial, the court awarded the parties joint custody of the minor child and named Laura as the domiciliary parent. The judgment further stated that until the child started kindergarten, William would have visitation at his home one month out of four, and the Thanksgiving holiday. Once the child started school, William would have visitation for five weeks in the summer, and every other holiday period, as recognized by the child's school system, for Thanksgiving, Christmas, New Year's, and Easter, alternating each year so that each parent could enjoy Christmas with the child every other year. The judgment further ordered William to pay $100.00 per month in child support and one-half of the child's medical insurance policy cost and one-half of the medical bills remaining after all insurance payments had been applied.

3

III.

## LAW AND DISCUSSION

### Standard of Review

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). This is especially applicable in a child custody dispute wherein appellate courts accord substantial deference to the trial judge's conclusions. "The trial judge is in a better position to evaluate the best interest of a child from his observance of the parties and the witnesses and his decision will not be disturbed on review absent a clear showing of abuse." *Deason v. Deason,* 99-1811, p. 2 (La.App. 3 Cir. 4/5/00), 759 So.2d 219, 220 (citations omitted). Both the Louisiana Legislature and the Louisiana Supreme Court have made it abundantly clear that the primary consideration and prevailing inquiry is whether the custody arrangement is in the best interest of the child. *See Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731.

### Domiciliary Custody

At trial each party presented evidence of the other's negative drinking habits, erratic behavior, and uncontrolled temper tantrums. The most pivotal event occurred in late January of 2004, a couple of months after the baby was born. The couple began an argument which ended with William pinning Laura to the wall, Laura spitting on William, and William striking Laura about the face and head, resulting in significant facial bruising. Laura reported the incident, and thus began months of involvement with the Family Advocacy Program at Fort Polk, with various child protection and social service organizations, with marital counseling and anger management programs. The precipitating event was subsequently substantiated, after

4

investigation, as "moderate physical spouse abuse" with William as the offender and Laura as the victim. William was reprimanded, and his Air Force record documented.

Subsequently, while Laura remained in the government housing unit, e-mails between Cassandra Bagwell of Fort Polk's Family Advocacy Program, and William's commander, Gary "Mad Dog" Ducote, Lt. Col., USAF, indicate ongoing struggles over exchanging the child for visitation, with each accusing the other of deviation from the agreement. William reportedly issued subtle threats to Laura, and his part-time job at a bar became an issue while he was being assessed for a possible alcohol problem. Additionally, the record reveals that William received a letter of counseling for drinking while operating an ATV and dirt bike in March 2004. Likewise, William asserts that Laura was previously counseled about her drinking in Germany.

One e-mail from Ms. Bagwell reported that someone vandalized Laura's Jeep, wrote "bitch" with shoe polish across the windshield, and slashed the Jeep's windows with a sharp object. Ten days later, the commander conducted an unannounced inspection of Laura's house and documented "deplorable" conditions with evidence of parties and above-normal alcohol consumption. Testimony indicated that this inspection had indeed occurred the morning after a barbeque with neighbors. Inspections by Family Advocacy found no substandard living conditions. The e-mails from Ms. Bagwell document her frustration at not being able to get the Air Force to cooperate in getting funds from William for child support or even sufficient food and supplies for the baby. One e-mail reported that William had tried to "strike a deal" with Laura's dad wherein the dad would provide the support instead of William. In the meantime, the e-mails of William's Air Force commander

documented his distrust of Laura, indicating that she was affecting William's relationship with his superiors and that she needed to get off the base.

With regard to the vandalized Jeep, we note that Ms. Bagwell did not indicate that William himself had vandalized the Jeep, but, due to escalating events, she suggested that future custody exchanges should be done with an escort, and "preferably someone who is not a buddy of Airman Steinbach." We further note that a serviceman neighbor of Laura's, Private Travis Thompson, who exchanged vehicles with her on occasion because hers was unreliable, testified at trial that her Jeep's gas tank had sugar poured into it. Private Thompson was later confronted by William for driving the couple's Jeep.

The record also contains testimony of a pastor's sister, Nelwyn Moore, who was a member of the church helping Laura with food and supplies. She testified to receiving a rude visit from William late at night regarding property in her yard that he claimed was stolen from him. Laura's parents, both of whom are educators, also testified at trial. Laura's father, David Landsburg, testified to events wherein William lost his temper in their presence. He heard William curse Laura loudly during an argument in front of the child, using the "f" word in every context possible, as an adjective, noun, verb, and adverb. Mr. Landsburg also recalled a family event on a lake wherein William let out a primal scream and jumped in the lake in frustration when he could not properly dock two boats together. Likewise, the trial judge heard William's parents and friends testify regarding Laura's drinking and emotional outbursts, as well as a perceived deficient care of the minor child. Witnesses testifying on behalf of Laura testified that she took very good care of the baby and was a loving mother. In particular, Mrs. Nelwyn Moore, the church member, testified that she just loved Laura and the way she communicated with the baby, teaching him

6

sign language, and further testified that Laura and the child were happy and affectionate and well-behaved.

In his detailed and well-thought-out Written Reasons regarding custody, the trial judge analyzed the factors in La.Civ.Code art. 134. He found Paragraph 7, regarding the mental and physical health of the parties, to be relevant and discussed the report of Dr. John Simoneaux, the court-appointed psychologist who evaluated the parties in 2004. Dr. Simoneaux reported that both parents appeared capable of providing their child with love and care but suggested, based purely on the psychological evaluation and available information at the time, that William was psychologically more stable and "possibly better able to provide for the child as the primary custodial parent." However, the trial court noted that, in his March 2005 deposition, Dr. Simoneaux stated that William's failure to provide support could affect his opinion. He subsequently opined that the effects of Laura's significant hearing impairment must be factored in to all of the reports, possibly suggesting that the complaints may have a different import than would be the case if there were no hearing impairment.

The trial court then discussed the opinion of Dr. Nancy Eldredge, whose deposition was taken in April 2005 for the purpose of impeaching Dr. Simoneaux's interpretation of Laura's test results, particularly the MMPI-II test (Minnesota Multiphasic Personality Inventory - II). Dr. Eldredge opined that Dr. Simoneaux's interpretation of the test results could be misleading due to Laura's hearing impairment. Dr. Simoneaux had agreed that this was possible but felt that her impairment did not affect the test results. The trial court then noted that some of Laura's conduct was irrational, but it considered her testimony as credible that the trauma caused by the breakup of the marriage precipitated the conduct. Further, the

7

court noted that the family counselors corroborated Laura's testimony that she did not want the divorce.

The trial court then discussed Paragraph 3 of La.Civ.Code art. 134, regarding the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs, stating as follows:

> Will mistakenly took the position, which was endorsed by the USAF, that free housing and utilities provided by the Government fulfilled his obligation mandated by this paragraph. He gave Laura the sum total of $100 over the period from their separation in June '04 to the time of trial in August of '05. During this time, Laura relied upon her disability check of $435 [sic] per month, charity from a church, and support from her family and friends to provide herself and Jake with basic necessities and transportation.

The trial court next considered Paragraph 10 of Article 134 regarding the willingness and ability of each party to facilitate a close and continuing relationship between the child and the other party. He discussed Laura's willingness to obtain an apartment and stay in Louisiana, rather than move to Arizona with her parents, after William moved to Florida and she had to leave the government housing in January 2004. The court cited her efforts to continue equal sharing of their son and to avoid the necessity of having to transport the child a greater distance from Arizona to Florida. The trial court found that Laura demonstrated "a decided willingness to encourage and facilitate a close and continuing relationship between [the child] and his father." Accordingly, after considering all of the evidence, particularly William's failure to provide financial support and Laura's willingness to facilitate visitation, the trial court found that "it is more probable than not that it is in the best interests of the minor child that Mrs. Steinbach should be the primary domiciliary parent."

The record suggests that it must have been difficult to award custody to either of these young parents. The trial judge reviewed the hundreds of pages of

exhibits introduced at trial and also listened to live testimony for five days, which puts him in the better position to evaluate the evidence and to make credibility determinations. Based upon our review of the record and the reasons articulated above, we can find no manifest error or abuse of discretion in his decision to award domiciliary custody to Laura Steinebach.

With regard to William's assertion that the trial court failed to follow Dr. Simoneaux's recommendation, we believe the trial judge clearly articulated his reasons for not doing so. Moreover, we note that Dr. Simoneaux expressed additional concerns that would qualify his recommendation, such as William's work schedule, the couple's reliance on their own parents, and the doctor's inability to interview those grandparents. We also note that Dr. Simoneaux's final recommendation may have been influenced in part by written material that he received about Laura, possibly before he interviewed her on November 2, 2004.

More specifically, Dr. Simoneaux's report indicates that he received a "long letter" dated November 1, 2004, the date of William's interview, from William's attorney, outlining numerous specific incidents of Laura's objectionable behavior in detail. The letter called her conduct volatile and bizarre; it attached unfavorable e-mails and one letter, from a serviceman to William, describing Laura as a "pathological liar." The letter from William's attorney further provided editorial comments attacking Laura and painting William as the victim, basically arguing the defendant's case to the psychologist. Dr. Simoneaux specifically noted in his report that he received no such background information on William from Laura's attorney. Additionally, much of William's interview was spent accusing and criticizing Laura, covering three full pages of the report in fact, while only a few paragraphs were dedicated to his personal history. Thus, it appears that Dr. Simoneaux would have

been hard-pressed to begin his interview of Laura without pre-conceived notions about her character. In spite of all of the scathing criticism, however, William did admit in the interview that Laura is a good mother.

By comparison, Laura's interview was filled with positive information about William, that the pregnancy was unplanned, but William was very supportive. She described William's excitement when their son was born and stated that he was a good father in the early months, helping when he could. She stated that it was difficult when he worked long hours, because she did not have the child monitor for the deaf, so that William had to keep waking up. Ultimately, her mom gave her the needed monitor. Laura admitted to having mood swings, postpartum depression, and outbursts. She stated that she tried to follow the advice of William's parents who advised her to take antidepressants, which did not help. Laura described problems in the marriage mostly in terms of her problems with William's parents and William's problems with her parents. She did criticize him briefly for spending money on new vehicles, 4-wheeler, etc., and for the final break-up when he left her at her parents' house in Arkansas and drove to Florida.

In his report Dr. Simoneaux stated that William's answers on the Minnesota Multiphasic Personality Inventory - II (MMPI-II) yielded a somewhat guarded profile, meaning that he tried to give a "middle of the road" response set, responding to the items in a measured and emotionally cautious way. That is, his answers demonstrated emotional sophistication but at the same time an unwillingness to admit being knocked off balance by emotional problems, all of which could indicate a conscious attempt to distort the scores and make him appear psychologically healthier and more emotionally balanced than he really is. Dr. Simoneaux reported that Laura's responses on the same test produced a clinically

elevated profile, indicating a propensity to feel implied rejection or criticism and to jump to conclusions and focus on how she has been hurt and how others are at fault.

Dr. Simoneaux stated that Laura's answers reflect that she read the questions carefully and answered them honestly, and there was no evidence that she tried to distort the scores in any way. Accordingly, we conclude that the trial judge gave the appropriate weight to Dr. Simoneaux's report and recommendation, and we find no manifest error or abuse of discretion in awarding joint custody to the parties with domiciliary custody to Laura, who had been the child's primary caregiver for all of his young life.

*NEW TRIAL*

Following the trial of this matter in the Fall of 2005, William filed a motion for a new trial, seeking to have himself named as the domiciliary parent to the minor child. The trial court denied his motion, and William asserts on appeal that it was error to deny him a new trial on the issue of custody. The applicable law regarding entitlement to a new trial is found in La.Code Civ.P. arts. 1972 and 1973. Article 1972 provides that a new trial shall be granted (1) when the verdict or judgment appears clearly contrary to the law and evidence or (2) when a party discovers after trial important evidence that could not, with due diligence, have been obtained before or during the trial. La.Code Civ.P. art. 1972. Article 1973 provides that a new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.

William argued, pursuant to Article 1972, subpart (1), that the judgment awarding custody to Laura was contrary to the evidence adduced at trial because the report of the court-appointed psychologist, Dr. John Simoneaux, recommended William as the domiciliary parent. We have already addressed the report and

recommendation of Dr. Simoneaux and determined that the trial judge did not abuse his discretion in his decision regarding the report and deposition of Dr. Simoneaux. William also argued under La.Civ.Code art. 1972(2) that he discovered evidence after trial that is relative to the issue of custody, and that it was error not to grant him a new trial based upon this evidence.

More specifically, William attached pages of Laura's "web blog" to his motion for a new trial, showing various entries made in January 2006. He argues that the entries show that Laura possibly had a relationship and sleep-overs with a Mr. Samuel Clark during the separation while she denied at trial that she was dating. He further argues that the evidence shows that Mr. Clark moved to Arkansas to live with Laura in October 2005, and he attaches an Arkansas news announcement as evidence that they purchased a marriage license around December 11, 2005. We note that both of these events occurred *after* the trial ended in September 2005, and that they do not prove the extent of the relationship at the time of trial. William also asserts that the blog entries indicate that Laura spent too much time on the internet when she should be caring for the minor child, and he asserts that they show her "intense hatred" of his parents based upon the fact that she accuses them of cyberstalking her by reading her blogs on-line.

In denying William's motion for a new trial based upon this new evidence, the trial judge concluded that:

> [T]he evidence referred to in defendant's motion is evidence in the form of Internet statements which could have been used to impeach plaintiff's credibility at the trial. All of those statements occurred after trial, therefore, it is clear that defendant could not have discovered their existence before or during the trial because they simply did not exist at that time.
>
> It is the Court's opinion that statements by a witness made after trial which tends [sic] to contradict their

testimony at trial cannot properly be considered as the basis for granting a new trial unless such statements were made under oath. Even if they could be considered it is not clear that this could constitute evidence important to the cause.

Certain facts alluded to in the Internet postings did, however, exist prior to the trial, i.e., the extent of plaintiff's relationship with Mr. Clark. Be that as it may, these facts could have been obtainable by deposing Mr. Clark or subpoenaing him for trial.

Accordingly, William's motion for a new trial was denied. We agree with the trial court's reasoning on this issue. Witnesses were questioned about Mr. Clark and the possibility that he spent the night at Laura's house. Therefore, William knew of Mr. Clark's existence and could have subpoenaed him for trial. Testimony revealed that Samuel Clark was the grandson of Nelwyn Moore, with whom he was living when he and Laura became acquainted. Mrs. Moore and her brother, who was the pastor of the church that Laura went to and asked for help, were instrumental in providing food and supplies to Laura and the minor child when they were without support. Testimony further revealed that Mr. Clark's mother, and his father, who was the son of Mrs. Moore, were both hearing impaired, and that Laura came to know Mr. Clark through his deaf parents.

Some of Laura's web blog entries, that William attached as evidence to his motion for a new trial, comprise Laura's "Abuse Story," which is about William, and which contains the following excerpt:

[T]he harassment and the terror didn't end when he moved, amazingly, he found time to come all the way to Louisiana (. . . . picking up his son, or dropping him off . . . moving his stuff) and still bother me, and he still had some friends left, so he got them to help. Soon I had people shooting guns in my yard (quite possibly at my house, I found a bullet hole in my bedroom) throwing rocks thru my window, as well as the window to my son's room. They would park across the street and watch my house; they would follow me around town. I soon became too afraid to

13

stay in my house alone, so Mr. C [Clark] started sleeping on my couch, or my son and I would go to his place and sleep on his couch . . . . I was too terrified to go anywhere alone, someone was with me at all times . . . . I even had some one try to run me off the road 3 times. It was terrifying. . . .

Based upon the foregoing, much of the evidence supplied by William, which he offers as proof of true events, tends to damage his case for custody rather than support it. However, as the trial court indicated, none of the statements in the blog were made under oath, and even if they could be considered, it is not clear that these statements constitute evidence important to the cause. Indeed, the evidence tends to paint a picture of Mr. Clark as a protector without proving an improper relationship. We further note the irony of William's reference to Mr. Clark in his appellate brief as "this gentleman who apparently had been providing care for the child for almost a year." Again, this reference reflects positively upon Mr. Clark as a caregiver and provider, and does nothing to further William's argument that he himself should have been awarded domiciliary custody of the minor child. We find no error in the trial court's denial of a new trial in favor of William on the issue of custody.

**Visitation**

Both parties contend that the trial court erred in implementing the visitation order. Laura argues that it was error to require the child to go from his home in Arkansas to visit with William in Florida for a month every three months, due to the disruption in the young child's schedule, and because William lives with his parents, both of whom work full time, and that the child is placed in day care during the week while the household is at work. She asserts that the child's contact with William need only be *frequent and continuing* under La.R.S. 9:335(A)(2)(a), and

that the ordered visitation it is not feasible or in the best interest of the child under subpart (b).[1]  William asserts that it was error to force a father to be away from his son for three months at the time, and that the trial court gave no reasons for implementing this order where the parties had previously agreed to *equal sharing*, which is appropriate under La.R.S. 9:335(A)(2)(b).

With regard to William's argument for equal sharing, given the distance between the parties, we find that it is not in the best interest of this young child to be away from his primary caregiver for a prolonged period of time.  In *Evans*, 708 So.2d 731, the Louisiana Supreme Court determined that alternating, split physical custody every four months between the mother and the father living in different states was not in the best interest of a preschool child.  The expert psychotherapist in that case opined that a transfer between the mother in Washington and the father in Louisiana could potentially be deleterious because the young child needed predictability, routine, and consistency.  The expert stated that alternating split custody works in some rare cases in which the parties live close to each other.  However, as the court noted, distance is a factor.  Accordingly, given the factors of distance and the age of the child, we agree that equal sharing is not in the best interest of the minor child in this case.

In *Evans*, the expert opined that for a preschool child four days should be the maximum period of time that the child should go without some kind of

---

[1]La.R.S. 9:335 provides in pertinent part as follows:

A. (1) In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown.

(2)(a) The implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents.

(b) To the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally.

face-to-face contact with the primary caretaker. However, in that case, the biological father did not seek to prove paternity of the child until the mother had married another, and the father had not established a relationship with the child as William has in this case with equal sharing soon after the separation. Moreover, in the present case where no expert was called upon to evaluate the minor child, we cannot say that the trial court erred in awarding William visitation for one month out of four. We note that the photographs in the record depict a happy little boy with his dad at the beach and the park in Florida, and indicate a lovely home environment with William and his family, as well as a very nice day care facility near the house. We, therefore, affirm the visitation plan as ordered.

## Child Support

In the present case, the trial court's judgment ordered William to pay child support in the amount of $100.00 per month plus one-half of the medical insurance premium and one-half of the medical bills remaining after insurance payments were applied. Laura filed a motion for a new trial stating that the amount ordered was contrary to the law and evidence. The trial judge agreed and granted her motion, modifying and amending his prior judgment and providing Written Reasons on May 26, 2006, for a new judgment as follows:

> The Court deviated from the child support guidelines and failed to note its reasons. The Court considers that plaintiff is unemployed and defendant is paying community debts and is employed while attending college and approximately a third of his income is from the GI Bill. The Court also considers the distance between the parties and the importance of facilitating visitation between the child and its father. The guidelines provide for child support in the amount of $455.00. The Court deviates from these and requires the plaintiff [sic] to pay all costs of visitation.

Accordingly, the Court modifies and amends its judgment rendered January 19, 2006 awarding child support in the amount of $100.00, provided that defendant [William] shall also pay in advance the entire costs of transporting the child for purposes of visitation. Defendant shall also be entitled to such benefits available from the IRS for the support of the child until such time that plaintiff may be employed and thereafter the parties shall alternate such benefits annually.

Accordingly, on July 31, 2006, the trial court signed a new judgment ordering William to pay $100.00 per month in child support plus one-half of the medical expenses, plus the transportation costs for his visitation with his son. Laura appealed, arguing that William is underemployed and that child support should be calculated in accordance with La.R.S. 9:315 et seq., which allows the addition of travel expenses to the basic obligation but not, she argues, a reduction of the basic obligation. More specifically, La.R.S. 9:315.6, regarding other extraordinary expenses, provides for two categories of expenses that may be added to the basic child support obligation: (1) expenses associated with the cost of private school to meet the needs of the child, and (2) any expenses for transportation of the child from one party to the other.

A deviation from the child support guidelines is permitted, if the court finds that the support required by the guidelines would not be in the best interest of the child or would be inequitable to the parties. The record must contain oral or written reasons for the deviation, which are supported by the evidence. *McDaniel v. McDaniel*, 95-1314 (La.App. 3 Cir. 3/6/96), 670 So.2d 767. Additionally, the court must include in its reasons a finding as to the amount of support that would have been required under a mechanical application of the guidelines. La.R.S. 9:315.1(B)(1). In determining whether to deviate from the guidelines, the court's considerations may include an extraordinary community debt of the parties, or any other consideration

17

which would make application of the guidelines not in the best interest of the child or inequitable to the parties. La.R.S. 9:315.1(C)(5) and (8). "Deviations by the trial court from the guidelines set forth in this Part shall not be disturbed absent a finding of manifest error." La.R.S. 9:315.17.

In the present case, Laura argues that William, whose income was less than $3,000.00 per month at the time of trial in 2005, is underemployed because he voluntarily left the Air Force, where he made $48,575.00 in 2004 according to his 2004 Federal Tax Return. However, she has provided no proof of his earning potential as a civilian or that he is currently underemployed because he no longer makes $48,575.00 a year. While it is not a determinative issue, we note that William's honorable discharge from the Air Force shortly after he had re-enlisted for six more years, may have been less than entirely voluntary, but rather possibly the result of a "strong suggestion" because of the problems the young couple caused while based at Fort Polk. Laura herself states in one of her blog entries that William *had* to leave the service, and she cites various incidents of bad behavior on his part that are unsubstantiated in the record.

The trial court relied upon William's statements of "Income and Expenses of William Jacob Steinbach, IV," his "Verified Income Statement Pursuant to R.S. 9:315.2," and his check stub from the Breakers Hotel in Palm Beach Florida which showed an income of $1,993.33 per month, plus a GI Bill benefit of $1,000.00 per month for college associated expenses, for a total income of $2,993.33. Testimony at trial indicated that William was working and enrolled in college and maintaining a 3.5 grade point average. The "Louisiana Child Support Guideline Schedule of Basic Child Support Obligations," set forth in La.R.S. 9:315.19, indicates that the basic child support obligation for one child, of parents with a combined

monthly income of $2,950.00 to $2,999.00, is $455.00 per month, which is the amount recited by the trial judge in his Written Reasons.

The trial judge then took into consideration that William was paying the community debts, which appear to total $426.00. The trial court further took into consideration that one-third of William's income, or $1,000.00, was from the GI Bill, which we note may consist of some non-monetary compensation. Finally, the trial court considered the transportation costs associated with visitation. William's statement shows a monthly transportation cost of $540.60 for flight, car rental, and hotel expenses. It is not known whether this is an averaged amount, broken down by month, or an actual monthly amount since the parties were at one time exchanging the child every three weeks. If it is an averaged amount, it comes to $6,487.20 per year for visitation, which is reasonable, even where the visitation order reduced visitation to five or six times a year (every 90 days plus Thanksgiving), since flight, car rental and hotel expenses can fluctuate considerably. In fact, William's father testified at trial that the visitation costs were between $700.00 and $1,000.00, which is why William gave up his apartment and moved in with his parents.

Given the trial court's several stated reasons for deviating from the guidelines, including the community debts, his award of the minimum amount for child support, which is $100.00 pursuant to La.R.S. 9:315.14, appears within his discretion. However, with regard to the transportation costs specifically, Laura argues that the trial judge erred in *deducting* the transportation costs from William's obligation, where La.R.S. 9:315.6(2) appears to provide only for the *addition* of transportation expenses to the basic obligation. We disagree with Laura's assessment.

19

In *Gould v. Gould,* 28,996 (La.App. 2 Cir. 1/24/97), 687 So.2d 685, 693, our brothers in the second circuit affirmed the trial court's deduction of transportation expenses from the father's child support obligation. There, the father testified that gasoline cost him about $50 per round trip, and the motel room averaged $34 a night. Based on two round trips per month, and two nights of motel each trip, the court deviated from the guidelines by reducing the father's support obligation by $236.00. The second circuit found that the trial court was entitled to accept the father's testimony that these were necessary expenses for visitation. It further reasoned that if the mother were required to transport the children twice a month, the court would be entitled to *add* travel expenses to the basic support obligation. La.R.S. 9:315.6(2). However, since the father was shouldering the entire expense of visitation, the trial court was found to have the discretion to deduct this reasonable expense from the obligation. We agree, and we take this opportunity to review the parameters of the statute and reconcile our prior decisions with the second circuit decision in *Gould.*

More specifically, in *Brown v. Brown*, 01-0157 (La.App. 3 Cir. 9/12/01), 801 So.2d 1116, we found *Gould* distinguishable, because in *Gould* the father presented evidence of his travel expenses, where there was no evidence presented in *Brown.* Likewise, in *Jones v. Jones*, 628 So.2d 1304 (La.App. 3 Cir.1993), we found no abuse of discretion in the trial court's *failure* to consider the father's travel expenses where there was no evidence of the amount incurred. Additionally, this circuit stated:

> [I]t seems [La.R.S. 9:315.6(2)] permits the *addition* of travel expenses to the child support obligation but it does not appear to allow reduction of the obligation due to these same expenses. It contemplates a situation, we feel, where the domiciliary parent is responsible for transporting the children to the non-domiciliary parent for visitation purposes. Why, in this instance, should [the father who

20

moved] be *paid* for exercising his parental visitation rights? [*Jones,* 628 So.2d] at 1307.

While application of La.R.S. 9:315.6(2) appears to provide for inconsistent relief depending on whether the custodial parent or non-custodial parent moves from the state, in the instant case, we need not revisit the parameters of the statute because the record contains no evidence of the amount of any travel expenses.

*Brown v. Brown*, 801 So.2d at 1123.

In the present case, both parents moved out of state, and, unlike *Brown* and *Jones,* there was evidence of travel expenses associated with the visitation in the form of William's income statement and the trial testimony of William's father. Moreover, in this case, the trial court enunciated additional reasons for reducing the child support award that render the travel costs only one portion of the reduction. We have reviewed La.R.S. 9:315.8, which instructs us at subpart (E)(5) to calculate *joint custody* child support obligations using worksheet "A" at La.R.S. 9:315.20. That worksheet was not attached or discussed by the trial court in this case, possibly because Laura is unemployed. Pursuant to our review, we note that, contrary to our comments in *Jones* and *Brown* the statutes do provide for a reduction of the child support obligation for visitation travel expenses for the non-domiciliary parent.

More specifically, La.R.S. 9:315.8, governing the calculation of the total child support obligation, provides at subpart (D) that the non-domiciliary party shall owe his or her total child support obligation to the custodial or domiciliary party, "*minus* any court-ordered *direct payments made on behalf of the child for work-related net child care costs, health insurance premiums, extraordinary medical expenses, or extraordinary expenses* provided as adjustments to the schedule." La.R.S. 9:315.8 (emphasis added). The subtraction of the "direct payments" is also provided for in the referenced La.R.S. 9:315.20, Worksheet A, at Item (8). While

both the pocket part and the computerized version of Worksheet A have different typographical errors and omissions in Item (8), it is clear that Item (8) was intended to mimic the language in La.R.S. 9:315.8(D) above. See also Item (12) in Worksheet "B" which is used to calculate support obligations in *shared custody* awards under La.R.S. 9:315.9, and which contains similar language.

Therefore, William's directly paid expenses, including transportation costs (an extraordinary expense under La.R.S. 9:315.6), which he reported at $590.00 per month in April 2005, as well as his child care costs, a work-related expense reported at $560.00 on his income statement, though not discussed at all by the trial court, would all be subtracted from his side of the child support obligation under item eight (8), had the trial court placed a work sheet in the record. We assume that he did not because Laura's side of the equation, as a non-working mother of a child under five, would be zero because her percentage share of income is zero, and zero is the multiplier that determines her final obligation.

In any event, it is clear that William's expenses exceed the mechanical child support guideline amount of $455.00, particularly in light of the community debts of $426.00 per month, which could be considered extraordinary under La.R.S. 9:315.1, given William's income and expenses. Accordingly, the trial court did not commit an error of law in deducting the visitation travel expenses which are not an actual deviation since they are specifically provided for as an extraordinary expense under La.R.S. 9:315.6 and as a deduction under La.R.S. 9:315.8 and 9:315.20. Nor did he abuse his discretion in deviating from the guideline by considering the portion of William's income attributable to the GI Bill. We affirm the trial court's ordering William to pay child support in the amount of $100.00 per month plus paying his own visitation expenses.

## Federal Tax Credit

In the present case, the trial court's judgment following the parties' motions for a new trial, added the provision that William would receive the federal tax credit until Laura became employed, and thereafter, each would receive the credit in alternating years. Laura assigns as error the trial court's award of the tax credit to William because she is the domiciliary parent and because there was no contradictory hearing on the issue pursuant to La.R.S. 9:315.18. That statute provides that the domiciliary party is *presumed* to have the right to claim the federal and state tax dependency deductions and any earned income credit, but further provides that the non-domiciliary party whose child support obligation equals or exceeds fifty percent of the total child support obligation *shall* be entitled to claim the deductions if, after a contradictory motion, the judge finds that no arrearages are owed, and the right to claim the deductions would substantially benefit the non-domiciliary party without significantly harming the domiciliary party. La.R.S. 9:315.18.

Under the particular facts of this case, where Laura was not employed and was assessed no percentage of the child support obligation, William, by default, is responsible for the entire obligation. Since he is a working parent and has to pay day care expenses, the tax credit, which he showed as $1,000.00 on his 2004 tax return, substantially benefits him, and since Laura is not working and does not have day care costs, she is not significantly harmed by not receiving the credit. The record indicates that Laura sought interim child support in 2004, and that due to continuances, the only proceedings addressing child support are the subject proceedings, consisting of five days of trial in 2005. Laura did not make a claim for arrearages, and the trial court did not award any. With regard to the absence of a

contradictory hearing, we believe that logic guided the trial court in likely not perceiving a requirement for a hearing when only one party is employed.

Moreover, we note that pursuant to La.R.S. 9:315.18(B)(2)(a), the trial court did specify the years of entitlement to the credit by providing that the parties will alternate taking the credit when Laura becomes employed. We further note that there appears to be no precedent for the particular circumstances we have before us, and neither party cites to analogous cases. Accordingly, under the specific circumstances herein, we affirm the trial court's award of the tax credit to William.

IV.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court, awarding domiciliary custody and child support as stated to Laura, and awarding the tax credit and visitation as stated to William, is affirmed in all respects.

All costs are assessed to appellant, William Jacob Steinebach, IV.

**AFFIRMED.**