# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-071


**JAMIE KILLIAN COODY**

**VERSUS**

**JOHN ALLEN COODY**


**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. 2010-0168
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE

**********

**JONATHAN W. PERRY**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Candyce G. Perret, and Jonathan W. Perry, Judges.


**AFFIRMED.**

**Elvin C. Fontenot, Jr.**
**Attorney at Law**
**110 East Texas St.**
**Leesville, Louisiana 71446**
**(337) 239-2684**
**Counsel for Plaintiff/Appellant:**
       **Jamie Killian Coody**

**David L. Wallace**
**Attorney at Law**
**518 N. Pine Street**
**DeRidder, Louisiana 70634**
**(337) 462-0473**
**Counsel for Defendant/Appellee:**
       **John Allen Coody**

**Bobby Holmes**
**Attorney at Law**
**1800 Ryan St., Ste. 107**
**Lake Charles, Louisiana 70601**
**(337) 221-3028**
**Counsel for the Minor Children:**
       **Remington Coody and Brycen Coody**

**PERRY**, **Judge.**

In this child custody dispute, the mother appeals the trial court's judgment which rejected her claim for sole custody and maintained her as the domiciliary parent but utilized the implemental order to designate the father with the authority over medical treatment and the children's extracurricular activities. We affirm.

## FACTS AND PROCEDURAL HISTORY

Jamie Killian Coody ("Jamie") and John Allen Coody ("John")[1] were married on February 3, 2003 and were granted a divorce in 2010. At the time of their divorce, Jamie and John had two minor sons, Remington and Brycen,[2] born on October 12, 2004, and July 11, 2006, respectively. Ever since their divorce, Jamie and John have shared the joint custody of their two sons, and Jamie was designated as the domiciliary parent with the authority to make all decisions regarding their sons.[3]

On September 3, 2014, after considering pleadings and evidence, the trial court, among other incidental rulings, maintained joint custody and Jamie's designation as the domiciliary parent, but detailed the parents' allocation of the time periods during which each parent shall have physical custody of the children, ordered the parents to mediate every twenty-eight days, and determined an amount of child support and any unpaid medical bills that John may owe.

---

[1] By virtue of Uniform Rules–Courts of Appeal, Rules 5-2 and 5-1, there is no requirement that we preserve the identity of the parties. Accordingly, we have referred to the parties' given names.

[2] The youngest son's name is spelled differently throughout the appellate record. For consistency, we have chosen to refer to him as Brycen.

[3] The record does not reflect whether the initial custody and visitation award was by agreement of the parties or a considered decree. However, the record does show the subsequent two judgments, that of September 3, 2014, and February 8, 2017, were considered decrees.

Thereafter, on February 8, 2017, again after a trial on the merits, the trial court found Jamie and John in contempt of court,[4] continued the requirement that the parents meet with Mark Ifland ("Mr. Ifland") every twenty-eight days, ordered the two children to undergo individual and family counseling as needed, decreed that the counselor report to the court after six months regarding recommendations as to any modifications or changes to periods of physical custody, continued joint legal custody and Jamie's designation as the domiciliary parent, and tweaked the parents' periods of physical custody yet again.

On February 23, 2018, John filed a rule to change the designation of Jamie as the domiciliary parent or to return the periods of physical custody to that decreed on September 3, 2014. He also requested that Jamie be found in contempt of court for failing to allow him physical custody of the children on multiple occasions.

On March 1, 2018, John filed a motion for the issuance of a civil warrant for the return of his sons for purposes of court-ordered visitation. Forming the basis of this motion, John alleged that Jamie had recently denied him visitation with his sons on February 27, 2018, that this course of conduct by Jamie had occurred on at least three other occasions, and that he feared it would occur prospectively. Shortly thereafter, on March 19, 2018, Jamie filed a motion seeking sole custody of the two children.

The trial court conducted hearings on the cross-custody motions over three days, November 28, 2018, January 11, 2019, and August 20, 2019. After providing extensive oral reasons for judgment in which it found neither party proved a material change in circumstances to alter either joint custody or Jamie's designation as the

---

[4] The record is unclear as to the basis of the contempt. However, the judgment of February 8, 2017, does show that the trial court gave the parties suspended jail sentences and provided that John could purge himself of contempt by providing insurance cards to Jamie within ten days, and Jamie could purge herself of contempt by cancelling the immediate income assignment order within ten days.

domiciliary parent, the trial court maintained its earlier judgments, awarding joint legal custody of the two children to Jamie and John, designated Jamie as the domiciliary parent, found Jamie in contempt of court, and ordered counseling for the two children and the parents with Bruce Plauché ("Mr. Plauché"). Nonetheless, the trial court modified the implementation order, designating John with the authority and responsibility for making medical decisions regarding the children and for making decisions about the children's sports, band, and extracurricular activities.

Jamie appealed, contending that the trial court erred: (1) in modifying the joint custody implementation order to designate John with the authority to make the medical decisions as well as decisions about the children's sports, band, and extracurricular activities along with the responsibility for making certain the children attend all activities in which they participate; (2) in finding a material change of circumstance which affected the welfare of the children; (3) in failing to state for the record any findings that established it was in the best interest of these minor children to award domiciliary status to John over certain affairs of the children; and (4) in denying Jamie's request to modify the joint custody to sole custody to allow the children to participate in normal, regular school activities as well as extracurricular activities. [5]

## STANDARD OF REVIEW

The trial court's factual conclusions are given substantial deference by appellate courts in child custody matters. *Steinebach v. Steinebach*, 07-38 (La.App. 3 Cir. 5/2/07), 957 So.2d 291. Unless there is a legal error, "[t]he determinations

---

[5] Although in her brief to this court Jamie makes passing reference to that part of the trial court's judgment which found her in contempt of court for withholding her sons on five occasions (1/12/18, 2/16/18, 3/2/18, 9/28/18, and 10/12/18) from court-ordered physical custody with their father, she neither assigned this as an error nor argued in brief that such a decision was erroneous. She also makes no argument about the modified physical custody schedule the trial court imposed and the court-mandated counseling. Thus, these three aspects of the trial court judgment are not before us.

3

made by the trial judge as to custody . . . will not be set aside unless it clearly appears [from the record] that there has been an abuse of discretion[.]" *Nugent v. Nugent*, 232 So.2d 521, 523 (La.App. 3 Cir. 1970); *see also Mulkey v. Mulkey*, 12-2709 (La. 5/7/13), 118 So.3d 357. "The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts." *McCorvey v. McCorvey*, 05-174, p. 4 (La.App. 3 Cir. 11/2/05), 916 So.2d 357, 362, *writ denied*, 05-2577 (La. 5/5/06), 927 So.2d 300.

Absent legal error, before a court's factual findings and conclusions can be reversed, appellate courts must "review the record in its entirety and (1) find that a reasonable basis does not exist for the finding, and (2) further determine that the record clearly establishes that the fact finder is clearly wrong or manifestly erroneous." *Moss v. Goodger*, 12-783, p. 4 (La.App. 3 Cir. 12/12/12), 104 So.3d 807, 810. If the trial court's findings of fact are reasonable, appellate courts should not reverse them. *Id.* However, appellate courts are also prohibited from simply rubberstamping a trial court's findings of fact. *Id.* Instead, appellate courts are constitutionally mandated to review all the facts contained in the record and determine whether the trial court's findings are reasonable considering the entire record. *Id.*

Additionally, when a trial court applies incorrect legal principles and these errors materially affect the outcome of a case and deprive a party of substantial rights, legal error occurs. *Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731. "[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Id.* at 735.

4

## LAW AND DISCUSSION

Although Jamie asserts four assignments of error, her arguments center on the trial court's decision to grant John the decision-making authority over their children's medical care and their sports, band, and extracurricular activities. That argument necessitates that we evaluate the three issues raised in Jamie's assignments of error: (1) whether the trial court erred in finding a change in circumstances that materially affected the welfare of the children since the last court order; (2) whether the trial court considered the best interest criteria that permeates child custody matters; and (3) whether the trial court's failure to award Jamie sole custody was erroneous.

The paramount consideration in any determination of child custody is the best interest of the child. La.Civ.Code art. 131. The best interest of the child is the sole criterion to be met in making a custody award, as the trial court "sits as a sort of fiduciary on behalf of the child, and must pursue actively that course of conduct which will be of the greatest benefit to the child." *C.M.J. v. L.M.C.,* 14–1119, p. 17 (La. 10/15/14), 156 So.3d 16, 28 (quoting *Turner v. Turner,* 455 So.2d 1374, 1378 (La.1984)). It is the child's emotional, physical, material, and social well-being and health that are the court's very purpose in child custody cases; the court must protect the child from the real possibility that the parents are engaged in a bitter, vengeful, and highly emotional conflict. *C.M.J.,* 156 So.3d 16. The legislature has mandated that the court look only to the child's interests so that the court can fulfill its obligations to the child. *Id.*

However, in actions to change custody decisions rendered in considered decrees, an additional jurisprudential requirement is imposed. *Evans,* 708 So.2d 731. When a trial court has made a considered decree of permanent custody, the party seeking a change bears the heavy burden of proving that the continuation of

5

the present custody is "so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." *Bergeron v. Bergeron*, 492 So.2d 1193, 1200 (La.1986). "Although the trial court retains a continuing power to modify a child custody order, there must be a showing of a change in circumstances materially affecting the welfare of the child before the court may consider making a significant change in the custody order." *Id.* at 1194.

Louisiana Civil Code Article 134 provides a non-exclusive list of factors which the trial court shall consider with all other relevant factors for the determination of the best interests of the child, and the determination as to the weight given each factor is left to the discretion of the trial court. *Hodges v. Hodges*, 15-585 (La. 11/23/15), 181 So.3d 700. "The illustrative nature of the listing of factors contained in Article 134 gives the court freedom to consider additional factors; and, in general, the court should consider the totality of the facts and circumstances of the individual case." *Id.* at 703. The consideration of all relevant factors under Article 134 should be followed in actions to change custody, as well as in those to fix custody initially. La.Civ.Code art. 134, 1993 Revision Comment (d).

However, the trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La.Civ.Code art. 134 but should decide each case on its own facts in light of those factors. *Breaux v. Breaux,* 96-214 (La.App. 3 Cir. 7/17/96), 677 So.2d 1106. The court is not bound to give more weight to one factor over another, and when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. *Moreau v. Moreau*, 15-564 (La.App. 4 Cir. 11/18/15), 179 So.3d 819. Moreover, the factors are not

exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. *C.M.J.*, 156 So.3d 16.

From the outset, we note that the trial court's oral reasons for judgment show that in addition to John's request to designate him as the domiciliary parent, an issue not before us, it considered two additional issues: (1) Jamie's request that she be granted sole legal custody; and (2) whether it should modify the implementation order to have John and Jamie share decision-making authority. We will individually address these two issues.

### Sole Custody

Jamie first argues that the trial court erred when it failed to award her sole custody of her two sons. We disagree.

Louisiana Civil Code Article 132 provides that "in the absence of agreement [among the parents], or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly[.]" However, as further provided in La.Civ.Code art. 132, "if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent." Thus, under La.Civ.Code art. 132, Jamie's burden was to prove by clear and convincing evidence that sole custody, as opposed to joint custody originally ordered, was in the best interest of her two sons. To prove a matter by clear and convincing evidence, a party must demonstrate that the existence of a disputed fact, in this instance, that sole custody was preferable, is highly probable or much more probable than its nonexistence. *Coleman v. Coleman,* 47,080 (La.App. 2 Cir. 2/29/12), 87 So.3d 246.

In her motion to modify custody, Jamie contended that John constantly badgered their sons concerning their previous court testimony, that John's new wife

exhibited extreme anger toward the two minors, that the two minors felt bullied and physically threatened, and that they wished to change the current visitation schedule.

The trial court heard testimony from Jamie and John about these issues. Jamie's testimony about these allegations was immediately met with John's denials. As to the boys' wishes to choose when they are with their individual parents, testimony primarily given by the eldest son, Remington, the parents presented differing testimonies–Jamie saying that it was news to her that her sons had told John and his attorney that they wanted to spend more time with him. With regards to the latter item, Mr. Plauche,[6] the licensed professional counselor who has met numerous times with the family members, meeting more often with Jamie and her sons than with John, stated:

> I think the biggest thing that we probably see is how we are getting the double answers from everything. And it is the possibility that [the two boys] are not lying. It is the possibility that when they are at John's house they really are . . . this kid, you know, they are the kid that fits in that house, and so they, you know, they are giving him these answers and while they are there that's their answers. And whenever they are at Jamie's house it's, you know, it's how they feel. And whether they are lying and whether they really are that stark opposite, I think that's where we are seeing the issue.

After conducting hearings over three dates, the trial court made several pertinent observations. Initially, it observed that the two boys are "very remarkable young men who have . . . from all indications done very well in school scholastically, extra-curricular [sic]." It further commented that the two boys are polite and have not posed any disciplinary problems at school or in public. The trial court also

---

[6] We note that in an earlier hearing, the trial court ordered counseling and directed the parties to Mark Ifland. Later, Mr. Iflin discontinued his practice as a counselor and referred Jamie to Mr. Plauche. Because Mr. Plauche was not named by the trial court, John chose not to always participate in counseling with Mr. Plauche because he perceived him as a counselor chosen by Jamie and did not feel comfortable with him for that reason. At the end of this most recent hearing, the trial court would remedy that problem of perception when it designated Mr. Plauche as the counselor to the parties and their children.

indicated that it could tell from the testimony of the two parents that they both loved their children.

Ultimately, the trial court concluded that it had seen nothing that met the *Bergeron* standard to change from joint custody to sole custody. Then it said that this case had been before the court over the course of almost ten years. In summary, the trial court stated, "It's more of the same disagreement and not getting along and miscommunication."

After thoroughly combing the record, we agree with the trial court's appreciation of the testimony, particularly in light of the heightened *Bergeron* standard and the requirement that Jamie prove by clear and convincing evidence that sole custody, as opposed to the joint custody originally ordered, was in the best interest of her two sons.

For reasons fully outlined above, we find Jamie failed to show by clear and convincing evidence that sole custody was in her sons' best interest.

**Legal Authority**

Jamie next argues that the trial court's splitting of legal authority impermissibly makes Jamie and John co-domiciliary parents in violation of the disavowal of such designation in *Hodges*. We disagree, finding Jamie's argument ignores the provisions of La.R.S. 9:335 and the explanation *Hodges* provides.

After a trial court determines to award joint custody to the parents, La.R.S. 9:335 governs the designation of a domiciliary parent as well as a court's determination of the details of the custody arrangement. The court in *Hodges*, 181 So.3d at 704-05, elaborates as follows:

> The meaning of "domiciliary parent" derives from La. R.S. 9:335. *See* La. R.S. 24:177(B)(1) ("The text of a law is the best evidence of legislative intent."). As La. R.S. 9:335 is laid out, its first part, section (A)(1), makes the general provision for joint custody and indicates an "implementation order" is the default plan for joint custody. However,

section (A)(1) also indicates an "implementation order" is not always required; there is an exception for the issuance of an "implementation order" when there has been "good cause shown."

Section (2)(a) then indicates that when rendered, an implementation order "shall allocate time each parent shall have physical custody," with the goal of joint custody being "that the child is assured of frequent and continuing contact with both parents." Another goal of joint custody, described in section (2)(b), is that as long as it is feasible and in the child's best interest, "physical custody of the children should be shared equally."

However, physical custody is a separate matter from legal authority and responsibility over a child. As we previously observed, "[t]he term 'custody' is usually broken down into two components: *physical* or 'actual' *custody* and *legal custody*." *Evans v. Lungrin*, 97–0541, p. 19 (La.2/6/98), 708 So.2d 731, 737. Accordingly, legal authority and responsibility are addressed in the next section of La. R.S. 9:335 (section (A)(3)), which provides that an "implementation order shall allocate the legal authority and responsibility of the parents."

Clearly, as provided in La.R.S. 9:335, the trial court can designate a domiciliary parent and yet choose to allocate legal authority and responsibility between the parents. This is what occurred in the present case and did not constitute an impermissible creation of co-domiciliary parents.

Next, without reference to any supportive jurisprudence on the assertion that the higher *Bergeron* standard applied, Jamie argues that the trial court erred when it granted John the decision-making authority over their children's medical care and their sports, band, and extracurricular activities–authority granted to her alone as the domiciliary parent in the prior decree. We disagree.

"[P]hysical custody is a separate matter from legal authority and responsibility over a child." *Hodges*, 181 So.3d at 705. Although there is a plethora of jurisprudence finding the higher *Bergeron* standard applicable to physical custody,[7]

---

[7] *See Granger v. Granger*, 09-272 (La.App. 3 Cir. 11/10/09), 25 So.3d 162; *Jackson v. Harris*, 05-604 (La.App. 3 Cir. 12/30/05), 918 So.2d 1163; *Cedotal v. Cedotal*, 05-1524 (La.App. 1 Cir. 11/4/05), 927 So.2d 433; *DeSoto v. DeSoto*, 04-1248 (La.App. 3 Cir. 2/2/05), 893 So.2d 175; *Francois v. Leon*, 02-460 (La.App. 3 Cir. 11/27/02), 834 So.2d 1109; *Lee v. Lee*, 34,025 (La.App. 2 Cir. 8/25/00), 766 So.2d 723, *writ denied*, 00-2680 (La. 11/13/00), 774 So.2d 150 (*citing Davenport v. Manning*, 95-2349 (La.App. 4 Cir. 6/5/96), 675 So.2d 1230).

we find such standard inapplicable to a change in the allocation of legal authority as provided in the implementation order. As observed in *Lee v. Lee*, 34,025, p. 5 (La.App. 2 Cir. 8/25/00), 766 So.2d 723, 726, *writ denied*, 00-2680 (La. 11/13/00), 774 So.2d 150, the findings involving physical custody are based "upon the concerns underlying the *Bergeron* decision, including the harm likely to be caused a child by a change in environment[.]" Whereas physical custody involves the environmental interaction between the parents and children, legal authority focuses on the authoritative interaction between the parents as they navigate joint custody.

Addressing the legislative intent of La.R.S. 9:335, the first circuit in *Ehlinger v. Ehlinger*, 17-1120, pp. 9-10 (La.App. 1 Cir. 5/29/18), 251 So.3d 418, 426, observed:

> It would appear that the legislature, in requiring an allocation of the legal authority and responsibility regarding the minor children, intended to promote greater harmony between the parents by providing less opportunity for conflict. In order to accomplish this goal, we find that an implementation order should at a minimum allocate the legal authority and responsibility for major decisions, such as medical care, elective surgery, dental or orthodontic care, and school and/or preschool choices.

In line with *Ehlinger*, our supreme court "recognize[d] that trial and family courts facing the myriad challenges in fashioning remedies in joint custody cases need as many arrows in their judicial quiver as possible." *Hodges*, 181 So.3d at 709. "By making available an implementation order, **the legislature has given courts great procedural flexibility to craft a custody arrangement on a case-by-case basis that promotes 'the best interest of the child**.'" *Id.* (emphasis added). We now turn our attention to the facts of the present case.

The record shows that, although the parents have had a well-established history of disagreement with each other, Jamie testified that other problems began as the two children became older and more active. In particular, the children have

become involved in organized sports, band, and other interests; thus, a material change in circumstances has arisen. Corresponding with the children's increased involvement, issues have arisen with their participation in those activities, particularly how that involvement has detrimentally affected physical visitation with John.

Although there may have been other instances addressed in this most recent custodial battle, one occurrence particularly piqued the trial court's interest. The trial court heard evidence that Remington, an eighth grader, attended the homecoming dance with his ninth-grade girlfriend instead of coming to John's for a scheduled visitation weekend. Addressing Jamie, the trial court engaged her in a discussion about how her actions in allowing her son to not visit his father pitted the parenting concepts of the two parents. The following colloquy highlights this issue:

> THE COURT: . . . [D]idn't you realize that the whole reason why [Remington] didn't want to go is because he knew that you were going to let him go to the dance the next night, on Saturday night, and that dad had said he wasn't going to let him go to the dance the next night. . . .
>
> THE WITNESS: He said – He had told me that his dad flat out said, I'm not going to have your mom follow you around – us around if you go to the dance.
>
> THE COURT: But my point is, it wasn't he [Remington] didn't want to go because he didn't want to see his dad; he didn't want to go because he knew if he stayed with you, you were going to let him go to the dance and he knew his dad wasn't going to let him go to the dance?
>
> THE WITNESS: I guess so, yes, sir.
>
> THE COURT: Okay. And do you see that how – by you allowing him to do that, you undermine dad's credibility and authority with his child?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: And whether you said it verbally or not—I don't know, I wasn't there—but you are demeaning dad's ability to have a different opinion than you about an important decision in a child's life[.]

In a different vein, though one equally important, the trial court recognized that this pattern of behavior had resulted in John being denied court-ordered visitation on five occasions. Ultimately, the trial court would find Jamie to be in contempt of court for this pattern of behavior.

In addition, the trial court learned that Brycen, the younger son, participated in the Junior Chef competition, an extracurricular activity in which John independently involved his younger son during his regularly scheduled visitation without the knowledge of Jamie. Problems arose because Jamie, as the domiciliary parent, was required to sign the entry forms for Brycen's continued participation. Although Jamie did not oppose Brycen's continued participation, John would ultimately abandon Brycen's continued participation without explaining the reason behind that decision. Even though Jamie would testify that Brycen was not upset when his participation in this cooking competition ended, it nonetheless concerned the trial court.

Finally, the issue of the boys' participation in sports and band activities came center stage. Attendant with that issue was John's medical concerns for Remington's chronic knee problems and how sports participation may exacerbate that problem; complementing that issue was the problems that arose when John's court-appointed visitation conflicted with his sons' obligations to participate in sports and band practices and any physical therapy Remington may have required. As to these issues, the trial court heard testimony that Jamie encouraged more participation and John, who was not totally opposed to his sons' extracurricular pursuits, nonetheless favored less participation.

As we review this case, one that has involved this trial judge in the adjudication of child custody issues between these parents for almost a decade, it

exhibits a trial court who was all too familiar with the parties and their stances and exemplifies just such an instance recognized in *Hodges* that the trial court needed a full quiver to address the myriad issues before it.  In that light, the trial court crafted an implementation order to yet again guide two parents who just cannot seem to get along.  Against that backdrop, the trial court stated:

> Unfortunately, my take-away from this is that the two of you just – I'll use the word "hate" each other.  And so, if – I don't think dad's opposed to sports.  I think dad is opposed to sports because mom signed them up for sports.
>
> And I think mom was initially opposed to Master Chef or Junior Chef . . . not because she was opposed to it but because Dad didn't consult her before he sent in the paperwork.
>
> So, it doesn't matter what it is they never stop long enough to really think about "Is that what my children want to do?  Is that going to make them happy?"  But if the other parent had anything to do with it "I'm opposed to it", right off the bat.  And then "I'll find whatever reasons I want to justify that as we go along."

Later, the trial court, addressing the parents, continued:

> I hope both of you parents understand the predicament you put me in as a judge.  Because one of you is complaining about the other one's ability to make medical appointments and the lack of communication.  And quite honestly, it cuts absolutely both ways for both of you.
>
> The fact that [Jamie] doesn't communicate with you [John] ahead of time is more than evident.  And the fact that if any decision by [Jamie], whether it's a good decision or a bad decision, if she controls it and you [John] don't, you just shut down and don't want to have anything to do with it.  And that is an identification of the entire problem in this custody dispute.
>
> And the problem is neither one of ya'll can see that because you constantly blame the other for one hundred per cent of the problem and you can't see any of the blame being on yourself.
>
> I'm not saying – You know I started out with telling your lawyers how frustrating it was to hear all of this, but we are not getting any better as we go along.
>
> It's just both of you are so entrenched in disagreement with the other.  I don't know what decision I'm going to make.  I don't know

14

what difference it's going to make in any decision I make. Because neither one of ya'll can work through anything.

Finally, to cement its thoughts and to make its determination clear about the parents' obligations, particularly John's, and to provide a safety net for Remington and Brycen, the trial court stated:

> I am going to designate [John] as having the responsibility for making decisions affecting the children in regards to medical; that means making appointments, making sure the children are there, making sure that [Jamie] knows about those appointments immediately, about any illnesses immediately. He is also going to be responsible for making decisions about the children's sports, band, and extra-curricular [sic] activities. And he is responsible for making sure that they are in attendance at any and all activities that the children participate in.
>
> So, if the children want to play basketball and [John] says, no, end of discussion.
>
> Now if the children want to play bad enough, then they can convince their father that that is what they want to do, and I suspect that will be the case.
>
> Now in order to allow the children the ability to discuss that with their father, if they want to participate in something and he doesn't think that that's best for them, I'm going to continue the order that the children continue counseling with Mr. Bruce [Plauché] at least once per month, and that [John] attend any of those counseling appointments if requested to by Mr. [Plauché]. And I'm going to order that at least once per month that [John] and [Jamie] attend counseling with Mr. Plauché to discuss any issues that needed to be discussed.

After reviewing the record and the jurisprudence, we find no abuse of discretion in the trial court's decision. Clearly, the record shows the trial court's decision was made considering the best interest of the children. It further evidences the trial court's use of the implementation order to diffuse the animosity between the parents and improve the communication between the parents, as well as the communication between John and his two sons.

In the alternative, our assessment and determination of the trial court's division of legal authority would be the same even if we had applied the *Bergeron* standard to this case. The facts of this case not only establish a change of

15

circumstances and show that the continuation of the present allocation of authority is deleterious to the children, but further show the trial court's division of legal authority is in the best interest of the children. In particular, the trial court's realignment of parental authority tamps down one area of dispute, promotes discussion between the parents, and causes the children, who are now older and more active in extracurricular activities, to better communicate with their father. Finally, the trial court's mandated counseling functions as a tool to implement its order and addresses the best interests of the children.

For the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED.**