# Supreme Court of Louisiana

The Opinions handed down on the **15th day of October, 2014**, are as follows:

**BY CLARK, J.**:

2014-CJ-1119    C.M.J. v. L.M.C., WIFE OF C.M.J. (Parish of St. Tammany)

Retired Judge Thomas C. Wicker, Jr., assigned as Justice ad hoc, sitting for Hughes, J., recused.

Accordingly, we reverse the judgment of the court of appeal and reinstate the trial court's custody judgment, as well as the trial court's second judgment, containing the protective order and conditions concerning the mother's visitation privileges. REVERSED; TRIAL COURT JUDGMENTS REINSTATED.

SUPREME COURT OF LOUISIANA

NO. 2014-CJ-1119

C.M.J.

VERSUS

L.M.C., WIFE OF C.M.J.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF ST. TAMMANY

**CLARK, Justice**[*]

This case concerns a highly contested custody dispute over three minor children. After an eleven-day trial and extensive written reasons for judgment, the trial court awarded sole custody of the children to the father and conditionally reserved visitation privileges to the mother. The First Circuit Court of Appeal reversed and remanded for a new trial. The main issue before us is whether the court of appeal erred in finding the trial court abused its discretion in prohibiting the children from testifying at trial and not relying on a sexual abuse evaluation. After careful consideration of the record before us, we find no abuse of the trial court's great discretion nor do we find any manifest error by the trial court in this fact intensive controversy. We reverse the court of appeal's judgment and reinstate the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

C.M.J., (hereinafter, "the father"), and L.M.C., (hereinafter, "the mother"), were married in 1996. They had three children: C.T.J., a son, born in 1998; J.A.J, a son, born in 2001; and J.T.J, a daughter, born in 2007. The father filed for divorce in May

---

[*] Retired Judge Thomas C. Wicker, Jr., assigned as Justice ad hoc, sitting for Hughes, J., recused.

2011.

Incidental to his divorce petition, the father sought sole custody of the three minor children.[1] The father alleged that the mother (1) removed the children from the family home for extended periods of time on multiple occasions without giving notice to him; (2) kept the boys out of school for fifteen days straight; (3) refused the father access to his children; (4) falsely accused him in two different criminal jurisdictions of sexually abusing his then three-year old daughter, and kept those allegations a secret from him; (5) unnecessarily subjected the daughter to an intimate physical examination and forensic interview; (6) falsely accused the father of drugging both the mother and the children; (7) engaged in questionable parenting practices, including paying the older brothers to bathe their younger sister; (8) believed a medical conspiracy existed wherein medical professionals intended to hurt the daughter; and (9) acted with the intent of alienating the children from the father.

What followed were several months of highly contentious litigation, during which the mother filed several petitions for protection from abuse, averring physical and sexual abuse, only to voluntarily dismiss them herself. Further, at a pre-trial hearing, amidst these allegations, the mother stipulated to joint custody of the children. Also at this pre-trial hearing, the parties stipulated that they and the minor children would undergo a sexual abuse evaluation and a mental health evaluation by Dr. Alicia Pellegrin, a clinical psychologist, pursuant to La.R.S. 9:331.

The parties shared equal physical custody of the children until October 2011. On October 25, 2011, the mother filed a motion for emergency *ex parte* custody and injunction based on the recommendation of a Children's Hospital nurse, Ann Troy, that the three children receive "protective placement" away from their father, the

---

[1] The father alternatively sought to be named the domiciliary parent in the event joint custody was awarded.

"alleged perpetrator." The circumstances of this recommendation are as follows: the mother alleged that the daughter complained to her that the father hurt her rear end. Based on this alleged complaint, the mother brought the daughter to Children's Hospital in New Orleans, where she was examined by Nurse Troy. Nurse Troy referred the children to a social worker employed by the Department of Children and Family Services, Ashleigh Stevens. Ultimately, based on communication to the trial court by the Department of Children and Family Services, the motion for emergency custody was signed by the duty judge in favor of the mother.

The father later discovered that a videotape was made by the mother on October 4, 2011— predating the visit to Children's Hospital and the subsequently filed motion for emergency custody. The videotape showed the mother discussing the sexual abuse allegations with the daughter. Further, the mother allowed her sister to record a conversation with the middle son concerning the allegations. Because these recordings violated a court order which prohibited the parties from discussing the case or allegations with the children or allowing family members to discuss the case or allegations with the children, the father filed a rule for contempt and a motion in limine, seeking to prohibit the videotape's introduction into evidence, the use of any testimony influenced by such tapes, and the children's testimony. The father contended that the mother coached the daughter into falsely accusing him of inappropriate behavior and that the tape and the daughter's tainted statements were then used to garner the negative reports and testimony of Nurse Troy, Ashleigh Stevens, and anyone else who subsequently interviewed the child. Further, it was the father's position that the children's testimony would be contaminated due to the suggestability of the alleged coaching.

A hearing on the rule for contempt was conducted, and the trial court found the

3

mother guilty of two counts of contempt of court. The mother was fined a total of $500 and sentenced to sixty days imprisonment, which was suspended in favor of unsupervised probation for sixty days.

The trial court next considered the father's motion in limine. The court-appointed expert in clinical psychology, Dr. Pellegrin, testified at the hearing, as well as Nurse Troy. In open court on June 7, 2012, the trial court partially ruled on the motion in limine, prohibiting the mother from introducing into evidence or using in any manner the recordings of the children. The trial court referred to the merits the remaining subjects of the motion in limine, including the children's testimony and the testimony of others who may be influenced by the recordings.

An eleven-day trial, spanning the course of several months, ensued. The trial court heard testimony from the parties; Dr. Pellegrin; Lewis Eaton, an expert in licensed professional counseling and a licensed family therapist who counseled the parties; Nurse Ann Troy; Detective Scott Davis, a detective with the St. Tammany Parish Sheriff's Department who investigated the sexual abuse allegations; and Ashleigh Stevens.

The trial court also considered numerous reports, records, interviews and Dr. Pellegrin's evaluation for custody. By judgment dated December 26, 2012, the trial court prohibited the children from testifying, finding the testimony concerning any alleged abuse was tainted by the mother's manipulation. In oral reasons for ruling, the trial court explained that it was her belief the children were contaminated and were subject to such suggestability that any testimony from them would be unreliable and untrustworthy.

Additionally, once the trial court determined that the daughter was an unavailable witness, it heard the testimony of the maternal grandmother, who was testifying

4

regarding the daughter's initial disclosure of sexual abuse. La.Code Evid. Art. 804(B)(5) excepts from the hearsay rule a "statement made by a person under the age of twelve years and the statement is one of initial or otherwise trustworthy complaint of sexually assaultive behavior," if the child is unavailable to testify. The record shows the trial court limited the grandmother's testimony to the recitation that the daughter fearfully exclaimed "the bleed, the bleed" when the grandmother attempted to tickle her thighs during playtime. The trial court found this proclamation to be the initial disclosure by the daughter and that any testimony elicited afterward would be inadmissible hearsay. The mother objected and later proffered the grandmother's testimony.

Ultimately, on February 8, 2013, the trial court awarded sole custody of the minor children to the father, providing twenty-six pages of written reasons.[2] In pertinent part, the trial court stated:

> In reaching an opinion in this case, the Court considered all relevant factors, including the twelve non-exclusive factors contained in La. C.C. Art. 134 and makes the following findings on those factors to which there was testimony and evidence placed on the record.
>
> * * *
>
> **(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.**
>
> While both parents demonstrate ability to give the children love and affection, the testimony at trial hereof establishes that the father has the greater ability to give the children beneficial spiritual guidance grounded in traditional values and to continue their education and rearing. Religion has played a prominent role in both parents' lives of late, however, [the

---

[2] The judgment reflecting these reasons was signed on February 19, 2013. Additionally, a second judgment provided for no visitation with the children by the mother until or unless certain conditions were met, namely therapy approved by the court, upon which time, the mother would be allowed communication with her children via the internet and telephone. Upon three months of treatment satisfying the Court's conditions and upon an updated recommendation by Dr. Pellegrin, supervised visitation would be considered by the court. Further, the judgment issued a protective order prohibiting the disclosure and/or dissemination of the judgment and the written reasons for judgment except to appropriately qualified mental health professionals approved by the court.

5

mother's] "religious" practices at some point became bizarre and obsessive. Some of her activities that were proven at trial, involved placing salt on the baseboards of the family home and crosses in oil on the doors to keep out the evil spirits and examining [the father] upon his arrival at home after work to see if his eyes had black circles under them, in order to determine if the "devil" was in him. If so, she commanded the devil, in "Jesus' name," to come out of him. [The mother]'s behavior, which often occurred in front of the children, included calling the father various names meaning "devil," locking herself in closets to "pray," locking the children's doors at night to keep out evil spirits, allegedly taking her sister to an exorcist to get the devil out of her sister, putting written prayers under beds and chair cushions to "knock" the devil out of the person using the furniture, and mumbling unintelligible languages at home and in public places, often swaying while doing so, and on one occasion, falling out on the floor in a convulsive fit in church, but not before looking behind her to see if her mother and sister were watching. The Court observed her during the last days of trial, while court was in session and also in recess, with her chin resting on her chest in a trance-like state for long periods of time.

### (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

The record reflects that, insofar as financial ability to care for the children is concerned, [the father] is gainfully employed at this time. He maintains substantial income handling administration and sales for Medical Corp Management. [The mother] has not been employed since she owned and worked prior to and early in the marriage in a "lingerie modeling" business. Her income at the time of trial was derived solely from [the father], from whom she received in excess of $90,000.00 per year in child support and spousal support. In the event [the father] is awarded custody of the children and/or [the mother] does not prevail in her claim for final spousal support from [the father], the fault trial being currently set before the Court on March 11, 2013, her ability to provide the children with material needs would be adversely affected, and presumably she would have to seek employment to maintain an income and provide for a home and for her needs as well as those of the children. There was no evidence offered at trial that she has the education or ability at this time to independently support herself and the children through available employment.

There was credible evidence adduced at trial that [the mother]'s motivation for making the allegations of sexual abuse against [the father], was, at least partially, monetary in nature. If successful in gaining sole custody of the children, she would maintain a substantial monthly amount of child support and spousal support from [the father], possibly supplemented by a money judgment in the civil suit she filed against [the father] in Jefferson Parish. The testimony and evidence established that she frequently held out to the children and her relatives, that [the father],

6

post-separation, did not support them and give them enough money to live, which was not based on fact, as was established at trial hereof. [The father] testified that, in September 2011, some months after [the mother] made the second set of sexual abuse allegations against him, she offered him a "deal" in a telephone conversation, to settle for "money" - that if he gave her one-half of his salary for the rest of his life, she would make him a "better" custody arrangement, consisting of alternating weekends and one day per week custody of the children. The Court finds this testimony to be credible, despite [the mother]'s denial of same, and this conversation between the parties most significant, as [the mother]'s escalation in pursuing previous abuse allegations she had made against [the father], including her recording of [the daughter], and her sister's recording of [the middle son], occurred soon after his rejection of the "deal."

On the issue of medical care of the children, the record reflects, and the Court finds, that [the mother]'s unfounded skepticism and paranoia about the medical profession and use of medication, has resulted in her medical neglect of her children. The children have not been vaccinated as recommended, their dental hygiene and care is abysmal, and [the mother] has jeopardized their access to health care by unjustly accusing their doctors and dentist, and/or their staffs, of attempting to harm or even "kill" her children. The Court finds [the father] to have the far greater capacity to understand and handle the children's medical needs.

### (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

The children have lived for the last year and one-half in [the mother]'s care, due to her allegations and the ensuing investigations and litigation. For the reasons listed herein, the Court finds, to maintain the children in that environment, removed from their father, is not in their best interest, and any benefit to the children in maintain [sic] the continuity of that environment is outweighed by the dangers posed to their mental and physical well-being if they were to remain in the current environment.

* * *

### (7) The mental and physical health of each party.

Both parents appear to be in good physical health, however, the mental health of the parents is a factor the Court finds must be attributed great weight in reaching a decision in the children's best interest.

Dr. Allicia Pellegrin, a clinical psychologist, who had been practicing for over fifteen years at the time of trial, was appointed by the Court as an expert and ordered to conduct a sexual abuse evaluation, and mental health evaluations of the parties, specifically addressing the issues presented in this case. She was appointed on August 15, 2011, after the Court held a conference with counsel to discuss the substitution of an

expert, as the previously appointed expert, Dr. John Simoneaux, was unavailable. There was no objection by counsel to her appointment, and she thereafter conducted an extensive mental health evaluation of the parties and made recommendations to the Court.

. . .

Dr. Pellegrin's testimony was taken over a period of four days at trial. On June 7, 2012, she testified in connection with the *Motion in Limine*, and also testified in the custody trial on September 7, 2012, September 10, 2012 and December 5, 2012.

She testified she conducted a custody evaluation and not a child sexual abuse evaluation in this case, because by the time she saw [the daughter], the child had been inappropriately "interviewed" by the mother on videotape, and any subsequent information that she could get from the child would, in her opinion, be highly suspect. She also testified that [the mother] admitted to her she had questioned [the daughter] repeatedly since the year 2010 about alleged sexual abuse by her father. She testified that the history revealed that the child had been taken to Children's Hospital at least four different times, and that the mother made a complaint of sexual abuse in late 2010 in Jefferson Parish which was investigated, but [the mother] did not follow up with the evaluation there after the child was interviewed and never told [the father] about the allegations or investigation. Dr. Pellegrin saw the parties on at least twelve occasions, over a six month period of time.

She testified that the "videotape" made by the mother of her interview with the child, [the daughter] [sic] was disturbing, stressful to the child, and pressured the child to respond in a certain way. She testified that [the mother] believes [the father] sexually abused her daughter and that the information that the interviewer believes is the information that comes out in the interview.

She testified that the fact that [the mother] allowed her young son, who was 12 or 13 years old at the time, the right to "interview" his younger sister who was 4 or 5 years old about the alleged sexual abuse allegation involving their father, was very concerning, disturbing and showed a total lack of judgment on [the mother]'s behalf. Dr. Pellegrin stated the two boys presented to her in a way that suggested the mother had negatively stereotyped the father to them, and that the fact that the mother and her sister engaged in behaviors (the "interviewing" and taping of the children) "blatantly flying in the face" of court orders suggests there is a problem with abiding by authority and the rules. Her opinion was that because the mother had custody of the children with no access to the father for an extended length of time, the children have had no choice but to align themselves with her.

In her opinion, there was probably never a properly conducted interview of the child, [the daughter], since [the mother] told her she spoke to the

8

child numerous times before she took the child to Children's Hospital the first time. She testified that all the major protocols recognized by experts in the field, require that an interview of a child be audio recorded and, preferably, video recorded in order to evaluate the interview properly. Only the two "interviews" [the mother] and her sister personally had with the children were taped and subsequently presented to the Court.

In questioning Dr. Pellegrin, [the mother]'s own legal counsel effectively agreed with Dr. Pellegrin's ultimate assessment of his client's "interview" with her child, prefacing a question to Dr. Pellegrin concerning the videotape made by [the mother] with the comment, "[w]ould you agree, as bad as that interview was on October 4, 2011 ..." (T.p. 94, 6.7.12).

Dr. Pellegrin further stated that, if the "tape made by the mother is a sample of the kind of questioning the child was subjected to, ... then I think it is reasonable to assume that prior questioning of the child went along similar lines." (T.p. 130, 6/7/12).

She testified about serious concerns she had with the interviews of the child and findings made at Children's Hospital by the nurse practitioner, Ann Troy, stating that Ms. Troy's opinion relied on outdated, inaccurate data, that does not take high conflict custody cases into account, that the personnel at Children's Hospital have a bias that "context does not matter," that the interview Ms. Troy conducted was not a forensic interview following any established protocol, that Ms. Troy's testimony that she could tell that there is a difference in the way a child presents information when they have been coached versus when they are telling the truth, is patently false, that she believes Ann Troy is an "advocate" and therefore biased.

Dr. Pellegrin testified that she told [the mother] that she recommended the children be immediately enrolled in therapy and [the mother] also enroll in therapy and that it was of great concern that she had not done so, and that it shows very little insight and judgment on [the mother] [sic] part.

Dr. Pellegrin diagnosed [the mother] with a mixed personality disorder, Axis II Cluster B, with three traits being present, that being borderline, histrionic and narcissistic traits, and she stated that these traits are not amenable to therapy as people who have this diagnosis have almost complete lack of insight.

She testified that [the mother] admitted to her that she had earlier stated the belief she was pregnant and the doctors hid this from her, that the doctors gave her "drugs" to possibly cause her a miscarriage and hid this from her. When asked by Dr. Pellegrin to explain these actions, she blamed it all on [the father]. [The mother] also admitted to her that she thought there was a "conspiracy" to kill the daughter. Dr. Pellegrin opined that these thoughts and beliefs of [the mother] are evidence of a specific delusion and are classified as psychotic in nature.

9

She testified she believes [the mother] has serious anger issues and that the children are not safe with her.

\* \* \*

She testified that [the daughter] was contaminated by the mother and that for the child to testify to the Court would be traumatizing at this point, and that it would be impossible not to be concerned about suggestibility for all three of the children, and further that it was not in their best interest to testify.

She testified that [the mother] telling the children she was worried they didn't have enough money and that's why she left the dad was "horrendous" and that [the mother] telling [the daughter] when [the daughter] was approximately 3-years-old, that her father "really slammed her mother into a wall," was "heinous and indescribable."

She opined that, if the allegations made by [the mother] were proven false, it would not be unreasonable for the Court to make a determination that [the mother] should have no contact with [the daughter] and any contact, if allowed, should be "limited and supervised, if any."

She further testified she had no concerns about the safety of the children with [the father]. Dr. Pellegrin's mental health examination of [the father], showed he did not exhibit any psychopathology and that he essentially tested "normal" for a parent involved in a high conflict custody case.

\* \* \*

### (13) Allegations of Abuse

The final and most important factor in this case , which the Court finds relevant and considered in addition to those cited in Art. 134, are the abuse allegations [the mother] made against [the father]. She alleged that [the father] had sexually abused their minor child, [the daughter], and had physically abused [the mother] and [their minor sons].

The evidence reflects that when [the mother] was unable to get the relief she believed she was entitled to after making her allegation to the authorities that [the father] was an abuser, she in desperation decided to take matters into her own hands and videotaped an "interview" she arranged with the child, [the daughter], who was then 4 years-old. Instead of proving abuse by the father, the tape stands as definitive proof of [the mother]'s mental abuse of the child including her exerting pressure, and using guilt and coaching techniques to manipulate the child into making false allegations. She concludes her "interview" by making the child promise to lie to her teacher as per her instructions, the next day. That [the mother] believed this tape would help her case is the best proof of the lack of insight Dr. Pellegrin addresses in making her diagnosis of [the mother]. The "videotape" was entered into evidence in the *Motion in Limine*. Any review of this case should necessarily start with examination of the videotape made by [the mother] and the equally flawed "interview"

her sister orchestrates with [the middle son]. How any expert who purports to understand how suggestible and vulnerable children, when subjected to this type of "interview" by a parent or relative they are obviously seeking to please, could be anything but contaminated thereafter, is incredible.

Detective Scott Davis, an investigator with the St. Tammany Parish Sheriff's Office Criminal Investigations Division, who has ten years experience in sexual abuse investigations, testified at trial. Detective Davis handled the investigation of sexual abuse allegations against [the father] made by [the mother]. He stated he has handled between 500 - 1000 sexual abuse cases in multiple parishes in the state, and had 23 years total experience in law enforcement. He initially received the complaint made in St. Tammany Parish from [the mother] in April 2011. Detective Davis has testified before the Court on numerous occasions and his vast experience with sexual abuse investigations is well known to the Court.

Detective Davis testified that [the mother] made "the videotape" of [the daughter] after he specifically requested her not to do so and after she had been court ordered not to do so. She also told him that she and the two boys had been drugged by [the father], but he found it significant that she waited two months to report this, and never had the medical tests which would have provided proof of same.

Detective Davis testified he conducted a thorough investigation, and the end result was that he was greatly concerned about [the mother]'s motivations, that there was no evidence or witnesses to support her allegations, and that when he would not subsequently arrest [the father], she and her family became very upset. Dr. Pellegrin testified Detective Davis told her that at this point [the mother] became "belligerent."

[The mother] testified she subsequently made a complaint against Detective Davis for not interviewing her "witnesses." Detective Davis testified that there was ultimately determined by the authorities involved, to be a lack of evidence to pursue criminal charges against [the father], both in St. Tammany Parish and in Jefferson Parish. The Court found Detective Davis' testimony to be credible and supported by the record.

Louis Eaton, who was qualified by the Court as an expert in licensed professional counseling and as a licensed family therapist, testified that both [the father] and [the mother] saw him for several sessions of family counseling beginning in 2007 and that he continued to see [the father] until February 2012.

He testified that, during the session he conducted with the couple, the physical abuse of each other and/or the children was not an issue, and that the main issue was [the mother]'s obsessive accusations of [the father]'s infidelity, despite the fact that there was no evidence of same. He stated that she was aggressive, angry and insecure, and [the father] was generally passive, and that when Mr. Eaton suggested that [the

11

mother] needed to examine herself and her past - she discontinued counseling.

Mr. Eaton diagnosed [the mother] as having borderline personality disorder, with histrionic and narcissistic traits, and also having dependent personality traits. He described her moods as labile and excessive. His diagnosis was remarkably similar to Dr. Pellegrin's diagnosis of [the mother].

After [the mother] ended her counseling with Mr. Eaton, he testified that she and her family members filed several complaints against him with his State Board and also with the pastor at the church he was connected with in his counseling practice, all of which complaints were unfounded and untrue. At the time of trial there was some indication made on the record by counsel, that the State Board complaints had been dismissed.

Mr. Eaton stated that he had seen [the father] in counseling sessions over many years - at least 60 - 70 times - and had no concerns about his ability to parent his children.

The Court found Mr. Eaton to be objective, unbiased, highly experienced in the matters to which he testified, and credible.

Ann Troy, was qualified by the Court as an expert nurse practitioner with expertise in medical exams of children suspected of being abused. She was employed at the time of trial with Children's Hospital in New Orleans and performed a medical exam and interviewed all three children in October 2011, upon [the mother]'s presenting with the children to the hospital. [Ms. Troy] testified on two different days of trial.

Ms. Troy testified concerning the history she took came from the mother and the children. She testified she assumed they were all telling the truth. Her interview was not a "forensic interview," and although she testified she uses interviewing techniques that "come from forensic interviewing," the evidence established her interviews with all of the children clearly do not follow any standard accepted protocol for "forensic interviews." She performed physical exams on all three children which were normal and she admitted that she performed no investigation of the case.

She stated she was never told a custody case was pending or that an evaluator had been appointed by the Court, and that if she had known those things, she would have only included it in her report, but this would not have been significant to her.

Her interviews of [the daughter] and the boys, which she termed "medical incident histories," were subsequent to multiple interviews of the children by many parties, over two years time in duration, none of which "interviews" have been established as a true "forensic interview." The worst examples of these prior "interviews" were the mother's videotaped interview of the child, [the daughter], and her sister's audiotape of [the

middle son]. Ms. Troy admitted she "blew it" by asking one inappropriate question of [the daughter] during her interview, however, the record reflects the entire interview is rife with inappropriate technique and questioning, as fully detailed in Dr. Pellegrin's testimony and supported by established and recognized standards and protocols.

It is deeply concerning to the Court that, based solely upon a self-serving history given by the mother; medical exams and "medical history" non-forensic interviews of the children, after they were brought by the mother to the hospital, which interviews meet no standards or protocols established for forensic interviews upon which some reliability may be placed; and all of this accomplished without the benefit of a thorough, objective investigation to establish any context, that a conclusion is made by a medical professional that a father has sexually abused his now 5-year-old daughter. That Ms. Troy's opinion was apparently made without any reference to, but with full knowledge of the "videotape" the mother had made of herself and the daughter, is remarkable.

The Court therefore attributes no weight to Ms. Troy's findings in this case, as the evidence and testimony elicited at trial established that the history given to her by the mother was inaccurate and the children's interviews were flawed and occurred long after the children were contaminated in this case. There was not even a cursory objective investigation or inquiry that would lead a reliable result in reaching any conclusion about whether or not these children had been abused and if so, by whom, and while the process at Children's Hospital may be adequate and in fact, designed, to determine the children's immediate medical needs and acknowledging their desire to advocate for children who have been abused is indeed laudable, it does not result in reliable evidence in this particular case that can be used in determining the ultimate issue before this Court.

For the same reasons, the testimony and conclusions drawn by Ashleigh Stevens, an employee of the State of Louisiana, DCFS, the Court finds to be based partially upon her misconception that the interview at Children's Hospital was "forensic interview" and that Ann Troy's conclusion that the child had been sexually abused by [the father] was based upon reliable evidence. Ms. Stevens further based her individual findings upon the videotape and audiotape of the children, presented to her by [the mother], which contained statements by the children obviously manipulated and orchestrated by [the mother] and her sister, against specific court orders. That Ms. Stevens has minimal experience is no excuse for training so faulty that she would not recognize the significance and implications of what is contained on the tapes made by the mother and her sister. Despite her admission that it was difficult to determine who was telling the truth in this high conflict case and that she never did manage to speak to Dr. Pellegrin, the Court's appointed evaluator, prior to reaching her conclusion, she made a valid finding for sexual manipulation and fondling of [the daughter] by her father. Since the information and history she received has been proven inaccurate, no

weight can be given her testimony or that of any of the thereafter referred mental health experts who provided subsequent therapy or treatment for the children.

## CONCLUSION

In the final analysis, based upon the overwhelming evidence in this matter, it has been proven to the Court by clear and convincing evidence that the mother has mentally and physically abused these children by making false allegations of sexual and physical abuse against their father and manipulating the children to make false allegations against their father over a long period of time, while using a most cautious court and medical system to her advantage, in an effort to align the children with her and alienate them from their father. The damage she has done to the children and [the father] is incomprehensible and can only be explained by her mental health diagnosis. There is no credible evidence that [the father] ever sexually abused [the daughter] or physically abused [the daughter], [the oldest son], [the middle son] or [the mother].

[The father] is therefore awarded sole custody of the three minor children, [the daughter], [the oldest son] and [the middle son]. Due to grave concerns the Court has about [the mother]'s deteriorating mental health, her failure to seek therapy as recommended by the evaluator and the distinct possibility that she is untreatable even if she enters therapy, her continued position that the [sic] [the father] is a sexual and physical abuser, and the possibility that unmonitored contact with their mother will further damage the already fragile children, no visitation with the children by the mother is ordered at this time.

In the event the mother enters treatment and cooperates and takes all recommendations of appropriately qualified mental health professionals, who are to be recommended by Dr. Pellegrin and appointed by the Court, and are to be provided with this opinion and have access to the entire record of this matter, in order to obtain a thorough history of this case, the Court will then allow monitored telephone and/or internet communication on a reasonable basis between the mother and the children. Thereafter, after a period of three months has passed after the mother enters into treatment, which period will allow the children time to reacquaint themselves with the father, whose love and affection they have been deprived of for over a year and a half, which will allow the father and the children to make up some of the lost time and repair the relationship, and will allow the children some time to engage in therapy, the Court will consider closely monitored supervised visitation of the mother with the children after an updated evaluation by Dr. Pellegrin, after she has communicated with [the mother]'s doctor, therapist or treatment providers and Dr. Pellegrin makes recommendations to the Court for visitation, with such restrictions and conditions as she deems necessary.

The mother appealed the trial court's rulings. The court of appeal reversed and

remanded with instructions, with one judge concurring. *Jones v. Jones*, 13-1270 (La.

14

1 Cir. 5/29/14), _So.3d_. The court of appeal found the trial court abused its discretion in not allowing the children to testify and that the reasons provided by the trial court were insufficient as a matter of law. The trial court, in the view of the court of appeal, erred in not personally observing the demeanor of the children to determine their competency to testify; instead, the court of appeal held that the trial court improperly deferred to Dr. Pellegrin's opinion that the children had been contaminated. Also, the court of appeal found fault in Dr. Pellegrin's refusal to perform a sexual abuse evaluation despite being tasked by the court with the role of performing one. The court of appeal found the trial court's reliance on Dr. Pellegrin's opinion, "which was not supported by the appropriate court-ordered evaluation," was an abuse of discretion. Accordingly, the court of appeal remanded for a new trial with a new court-appointed sexual abuse evaluator and for a determination of whether the children are allowed to testify. Finally, in its analysis, the court of appeal held that the initial disclosure exception to the hearsay rule allowed more testimony by the grandmother than what was admitted by the trial court; thus, it found the trial court erred on this ground as well.

The father filed a writ application with this court. The father also sought to stay the execution of the court of appeal's judgment. By order dated May 30, 2014, we denied the stay as unnecessary, citing La.Code Civ.P. art. 2166. Accordingly, the children have been in the care of their father since the trial court ruling in February 2013. We granted the writ to determine whether the court of appeal erred in reversing and remanding the matter for a new trial. *Jones v. Jones*, 14-1119 (La. 6/30/14), _So.3d_.

### APPLICABLE LAW

The paramount consideration in any determination of child custody is the best

15

interest of the child. La. Civ. Code art. 131; *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So.2d 731. La. Civ. Code art. 134 sets forth the factors a court is to consider in determining a child's best interest:

> (1) The love, affection, and other emotional ties between each party and the child.
>
> (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
>
> (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
>
> (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
>
> (5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
>
> (6) The moral fitness of each party, insofar as it affects the welfare of the child.
>
> (7) The mental and physical health of each party.
>
> (8) The home, school, and community history of the child.
>
> (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
>
> (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
>
> (11) The distance between the respective residences of the parties.
>
> (12) The responsibility for the care and rearing of the child previously exercised by each party.

This court in *Turner v. Turner*, 455 So.2d 1374, 1378 (La. 1984), stated the best interest of the child is the sole criterion to be met in making a custody award, noting:

> The trial judge sits as a sort of fiduciary on behalf of the child, and must pursue actively that course of conduct which will be of the greatest benefit to the child. It is the child's emotional, physical, material and social well-being and health which are the judge's very purpose in child custody cases. He must protect the child from the harsh realities of the parents' often bitter, vengeful, and typically highly emotional conflict. The legislature has mandated that the judge shall look only to the child's interests.

16

In furtherance of this important goal, the court has been vested with broad and independent powers. It may, for example, order that an investigation be conducted into the home lives of the parties, the psychological health of the child, or into any other factor which the judge deems to be important in his determination of the child's best interest. [Civ.Code art. 131]. In this way, the court can fulfill its obligations to the child.

The court of appeal cannot simply substitute its own findings for that of the trial court. *Mulkey v. Mulkey*, 12-2709, p.16 (La. 5/7/13), 118 So.3d 357, 368. The determination of the trial court in child custody matters is entitled to great weight, and its discretion will not be disturbed on review in the absence of a clear showing of abuse. *Id.*

## DISCUSSION

We begin our discussion with reiterating that the best interest of the child standard is the fundamental inquiry in child custody matters. La. Civ. Code art. 131. To promote this end, the legislature has expressly allowed for relaxed evidentiary rules in child custody cases. La. Code Evid. Art. 1101(B) states:

[I]n the following proceedings, the principles underlying this Code shall serve as guides to the admissibility of evidence. The specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding.
. . .
(2) Child custody cases.

We held in *Folse v. Folse*, 98-1976, p. 11 (La. 6/29/99), 738 So.2d 1040,1046 that the legislature did not "remove any gate-keeping discretion from the judge regarding admissibility of evidence" in cases where sexual abuse is alleged. Thus, while the standard of proving the sexual abuse was elevated from the ordinary "preponderance" standard to "clear and convincing," the evidentiary rules did not get stricter. *Id.*

The trial court in the instant matter found no credible evidence that the father ever sexually abused the daughter or physically abused any of the children or the mother. Instead, it found by clear and convincing evidence that the mother "mentally and physically abused these children by making false allegations of sexual and physical abuse and manipulating the children to make false allegations against their father over a long period of time." These were findings of fact made by a trial court that should not be disturbed on appeal absent manifest error. "It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of 'manifest error' or unless it is 'clearly wrong' . . . ." *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989).

The court of appeal found three errors by the trial court that warranted a reversal: (1) the trial court's refusal to allow the children to testify; (2) the trial court's reliance on Dr. Pellegrin's testimony despite her failure to perform the court-ordered sexual abuse evaluation; and (3) the trial court's limiting of the grandmother's testimony. We will review each of these assigned errors to determine whether there was manifest error in the factual findings or any legal error to justify a reversal of the trial court's judgment.

First, the court of appeal found the trial court abdicated her role in determining the admissibility of the children's testimony. In reaching this conclusion, the court of appeal found that the trial court "relied exclusively on the observations and evaluations of Dr. Pellegrin in determining that the children's testimony had been contaminated" and did not independently observe the minor children's demeanor. After a close review of the record, we find there was ample evidence beyond the opinion rendered by Dr. Pellegrin to support the trial court's decision to prohibit the children from testifying.

18

While the trial court had the benefit of Dr. Pellegrin's testimony—an expert who was appointed by the court and had only the children's best interest in mind—it also had other evidence to show the presence of false allegations and contamination, rendering any testimony by the children unreliable:

(1) The timing of the filing of the mother's petition was suspect. Just four days after the father was awarded temporary custody on June 17, 2011, the mother filed a petition for protection from abuse and a reconventional demand, alleging specific incidents of abuse that did not immediately precede the filing of the petition. Indeed, some of the incidents alleged predated the petition for protection from abuse by almost a decade, giving cause for a court to determine that these allegations may not have been motivated by truth but by desperation. Furthermore, the mother voluntarily dismissed the petition for protection from abuse. Again, this fact brings into question the validity of the claims. (2) Significantly, the mother filed yet another petition for protection from abuse, which she again voluntarily dismissed. (3) After making these heinous allegations of abuse, the mother stipulated to equal physical custody of the children. A mother's voluntary agreement to share custody with the man she believes harmed her children evidences a likelihood that abuse at the hands of the father did not occur. (4) The mother dropped the criminal charges she instigated against the father in Jefferson Parish, claiming her sister fabricated the allegations. Notably, the mother never told the father she pressed criminal charges against him. (5) There was no physical evidence of abuse. (6) After a thorough criminal investigation, the father was never arrested or prosecuted due to a lack of probable cause. (7) The primary evidence, if not the only evidence, against the father was testimony by Nurse Troy and Ashleigh Stevens, which was based on interviews of the daughter that occurred after her exposure to the alleged coaching by the mother and without the proper protocol

19

to render them forensic interviews.

Therefore, even without reference to the video tape that is the subject of much argument, we find abundant support in the record to support the conclusion that the mother fabricated the sexual abuse allegations.[3] The trial court considered all evidence and testimony before she ruled on the admissibility of the children's testimony. Having concluded that sexual abuse did not occur based on the foregoing evidence, the trial court found (1) the likely contaminated testimony of the children would serve no purpose in aiding it to make a fact-based determination and (2) that testifying would not be in the children's best interest.

We are ever mindful of the trial court's important role as the child's fiduciary and cannot underscore enough the overriding standard in custody cases: the best interest of the child. The trial court had the advantage of Dr. Pellegrin's extensive report which summarized every interview with every party and witness, including the children. In comparing the proffered testimony of the children to that summarized by Dr. Pellegrin in her report, we cannot say the trial court failed to benefit from any testimony the children would have provided. Instead, what was before the trial court in the form of Dr. Pellegrin's summary of the children's interviews is remarkably similar to what was proffered. If anything, a comparison reveals the summary that the trial court did review was more prejudicial to the father than the proffered testimony. Accordingly, we find no crucial evidence was overlooked due to the trial court disallowing the children to testify.

Moreover, we find the trial court's determination that testifying would not be in the children's best interest, coupled with the relaxed evidentiary rules in custody cases,

---

[3] This record is inundated with references to and conclusions made regarding the video tape of the mother questioning the daughter. We expressly decline to comment on the video-tape's admissibility into evidence, and we limit our discussion to a review of all other record evidence.

serve as added support for the exclusion of the children's testimony. Accordingly, the court of appeal's reversal on this ground was not warranted.

Next, we address the court of appeal's contention that a new expert should be appointed to perform a sexual abuse evaluation in light of Dr. Pellegrin's failure to do so. Pursuant to La. R.S.9:331, "[t]he court *may* order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown." The statute further instructs that the evaluation shall be performed "by a mental health professional selected by the parties or by the court." The trial court appointed Dr. Pellegrin to perform a sexual abuse evaluation and mental health evaluation. Neither party objected to the appointment.

We note that whether sexual abuse occurred is a factual finding that belongs within the province of the trial court's decision-making function. Expert witnesses are intended to "assist the trier of fact" in understanding the evidence or in the determination of a fact in issue. La. Code Evid. art. 702. Without question, the opinion of an expert may be given great weight by a trial court in its determination of the psychological well-being of a child or parent. However, this does not mean that the expert has usurped the authority of the trial court in determining the key issue of "best interest of the child." As we stated in our discussion of the exclusion of the children's testimony, this decision is based on all the evidence and testimony presented to the fact-finder. It is well settled in Louisiana that the trial court is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. *Green v. K-Mart Corp.*, 03-2495, p. 5 (La. 5/25/04), 874 So. 2d 838, 843. A trial court may accept or reject in whole or in part the opinion expressed by an expert. *Id.* Further, a trial judge may substitute his/her own common sense and judgment for that of an expert witness when such a substitution appears warranted on

21

the record as a whole. *Id.*

Importantly, the trial court found Dr. Pellegrin to be a reliable witness. As evidenced in the reasons for judgment, the trial court explained:

> Dr. Pellegrin's qualifications and expertise in performing child custody, sexual abuse and mental health evaluations are well established with the court. She testified that she has conducted nearly 500 custody evaluations throughout the State of Louisiana and over 90 of those contained sexual abuse allegations.

> Dr. Pellegrin attended every custody hearing in this matter over the six-month period of time it took to try this case. In addition to the time she spent with the parties, collaterals, and the children, while conducting interviews for preparation of her evaluation prior to giving her testimony, she also had the benefit of personally observing over 50 hours of additional testimony offered by the parties and their witnesses at trial. She was called back to the stand and testified at the end of trial after all the testimony and exhibits had come into the record.
> . . .
> The Court found Dr. Pellegrin's testimony and opinion in its entirety to be extensively researched and thoroughly supported by the record.

It was Dr. Pellegrin's professional opinion, in her capacity as a clinical psychologist, that the children's testimony would be contaminated and inherently suspect due to suggestability. Dr. Pellegrin explained:

> I did a custody evaluation. I did not perform a child sexual abuse evaluation. I did not because by the time I was able to get to the child[,] the child had already been interviewed by the mother with what we saw on that tape. And any subsequent information that I could get from that child, in my opinion, would be highly suspect.

Accordingly, Dr. Pellegrin, using her professional insight, chose not to conduct a sexual abuse evaluation. Nothing in the law requires that a sexual abuse evaluation be performed by a mental health professional when sexual abuse allegations are made; in fact, La. R.S. 9:331 makes evaluations subject to the trial court's discretion, as evidenced by use of the word "may." ("The trial court *may* order an evaluation . . .") *Id.* Thus, whether a sexual abuse evaluation was done is not dispositive of the issue

22

when such an evaluation would be only one piece of evidence for the trial court to consider. Furthermore, Dr. Pellegrin repeatedly testified that she was not giving an opinion as to whether sexual abuse occurred; rather, she gathered information in the form of interviews, records, and psychological observations to aid in the trial court's ultimate determination.

The trial court, in looking at the *totality* of the evidence, found no sexual abuse occurred. Based on the foregoing, we find no abuse of discretion in the trial court's reliance on Dr. Pellegrin's professional opinion that a sexual abuse evaluation could not be performed under the circumstances. Nor do we find any manifest error in the factual finding regarding the alleged abuse or in the factual findings that support the underlying custody judgment, which were so carefully and extensively justified in the trial court's reasons for judgment. Thus, this assigned error is meritless.

Last, we address the court of appeal's holding that the trial court erred in limiting the testimony of the maternal grandmother, who was the person to whom the daughter allegedly first disclosed the sexual abuse. Upon finding the daughter to be an unavailable witness by virtue of prohibiting the children's testimony, the trial court allowed the grandmother to be questioned about the daughter's first report of sexual abuse pursuant to the hearsay exception contained in La. Code Evid. Art. 804(b)(5).[4] The grandmother testified that while the daughter was in her care, the grandmother was "swinging her" and "playing with her in the den." The grandmother explained that she was tickling the daughter and when she "got to the thigh area she curled up. She had fear on her face and she said, 'The bleed. The bleed.'" The trial court limited the

---

[4] La. Code Evid. Art. 804(b)(5) provides as an exception to the hearsay rule if the declarant is unavailable as a witness:

A statement made by a person under the age of twelve years and the statement is one of initial or otherwise trustworthy complaint of sexually assaultive behavior.

23

grandmother's testimony to this expression, qualifying it as the initial disclosure. The mother objected, arguing the testimony only set up the context of the initial disclosure and not the complaint itself. The court of appeal agreed, finding the trial court did not allow the grandmother to testify to the complete complaint of sexually assaultive behavior.

According to the grandmother's proffered deposition, after the incident where the daughter said "[t]he bleed. [t]he bleed," the daughter clearly complained of sexually assaultive behavior to her grandmother. As with the children's testimony, we compared the grandmother's proffered testimony to that contained in Dr. Pellegrin's evaluation, which was reviewed by the trial court, and found a virtually identical recitation of the incident as told by the grandmother. Regardless of whether testimony about this complaint should have been allowed pursuant to La. Code Evid. Art. 804(B)(5), we find the information was reviewed by the trial court in the form of Dr. Pellegrin's custody report. Thus, we cannot say that the trial court's review of the evidence was lacking for want of this testimony, and any reliance by the court of appeal on this alleged error as a basis for reversal was improper.

## CONCLUSION

The best interest of the child standard is a fact-intensive inquiry that requires the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented. La. Code Evid. Art. 134. The trial court is in the best position to ascertain the best interest of the child and any findings made in furtherance of that best interest should not be disturbed on appeal absent a clear showing of abuse of discretion. *Thompson v. Thompson*, 532 So.2d 101 (La. 1988). Having found no legal or manifest error, we defer to the trial court's well-reasoned ruling.

**DECREE**

Accordingly, we reverse the judgment of the court of appeal and reinstate the trial court's custody judgment, as well as the trial court's second judgment, containing the protective order and conditions concerning the mother's visitation privileges.

**REVERSED; TRIAL COURT JUDGMENTS REINSTATED.**