# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 22-589


**CALEB JAMES SIMMONS**

**VERSUS**

**ASHLEY NIKOLE HODGES**


**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 100165-C
HONORABLE SCOTT WESTERCHIL, DISTRICT JUDGE

**********

## CANDYCE G. PERRET
## JUDGE

**********

Court composed of Candyce G. Perret, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.


**AFFIRMED.**

**Jack L. Simms, Jr.**
**Post Office Box 1554**
**Leesville, LA 71496-1554**
**(337) 238-9393**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Caleb James Simmons**

**Clay Williams**
**Williams & Nelson**
**Post Office Drawer 1810**
**Leesville, LA 71496**
**(337) 238-4704**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Ashley Nikole Hodges**

**PERRET, Judge.**

This appeal concerns the custody of the parties' biological minor child. Appellant Caleb Simmons appeals the April 11, 2022 Judgment awarding him joint legal custody of the child with Appellee Ashley Nikole Hodges, designating Ms. Hodges as the primary domiciliary parent, and setting forth a schedule of physical custody.[1] Mr. Simmons appeals, asserting the trial court erred in its judgment, particularly that physical custody was not awarded equally. On appeal, we affirm.

**FACTUAL AND PROCEDURAL HISTORY:**

The parties involved herein were in a prior relationship, living together for approximately four years, but not married, during which time they had a child together, S.S. S.S. was born on November 14, 2019. On April 15, 2021, the parties separated, and Ms. Hodges moved into an apartment with S.S. The parties continued visitation between S.S. and Mr. Simmons through a mutually agreed upon schedule. This agreed upon schedule was not implemented or approved by any court. However, once Mr. Simmons filed for custody on June 28, 2021, the agreement deteriorated.

In his petition, Mr. Simmons sought joint custody of S.S and requested that he be designated the domiciliary parent with reasonable physical custody awarded to Ms. Hodges as proposed in an implementation plan attached to the petition. Mr. Simmons also requested that, in lieu of child support, "defendant [be] ordered to pay one-half (1/2) of the daycare expenses" and he reserved "the right to pursue child support."[2] The attached implementation plan suggested that Ms. Hodges have

---

[1] The April 11, 2022 Judgment also made other rulings that are not at issue on appeal.

[2] Other requests were made in the petition, but only those mentioned have been raised on appeal.

physical custody of S.S. every Tuesday and Thursday beginning at 5:00 p.m. and every other weekend beginning Friday at 5:00 p.m. through Sunday at 5:00 p.m.

Thereafter, on July 8, 2021, Ms. Hodges filed an Answer and Reconventional Demand also seeking joint custody, but with herself being designated as the "primary custodial parent, subject to reasonable physical custody in favor of" Mr. Simmons as per the attached implementation plan.[3] Ms. Hodges based her request on the fact that she has been the child's primary caregiver since birth. Ms. Hodges also requested child support.

The custody petition was heard on March 28, 2022, wherein Ms. Hodges submitted into evidence copies of text messages as well as copies of her wage earnings and tax return. Mr. Simmons presented no documents as evidence. Both parties testified, as well as the paternal grandmother, Pamela Simmons, and Mr. Simmon's cousins, Jacob and Angela McBride.

The trial court provided oral reasons for ruling and signed a judgment on April 11, 2022. The judgment awarded joint custody to the parties with Ms. Hodges named as the primary custodial parent and physical custody of S.S. in favor of Mr. Simmons according to the Joint Custody Implementation Plan. The judgment also awarded Ms. Hodges child support in the amount of $546.00 "per month due and payable on the 1st of each month, beginning April 1, 2022, retroactive to July 8, 2021." Mr. Simmons was permitted physical custody of S.S. every other weekend from 6:00 p.m. on Friday until 6:00 p.m. on Tuesday. The implementation plan also set forth physical custody for summer vacation in favor of Mr. Simmons (two weeks in June, two weeks in July, and the first full week in August) and holidays.

---

[3] Ms. Hodges's suggested implementation plan is not in the record.

On appeal, Mr. Simmons assigns three Assignments of Error:  (1) the trial court's ruling was contrary to Louisiana law and jurisprudence, (2) the trial court abused its discretion in not awarding equal sharing of custody in this case, and (3) the trial court's ruling was clearly wrong.

**DISCUSSION:**

A trial court's determination regarding custody is "entitled to great weight, and [its] discretion will not be disturbed on review in the absence of a clear showing of abuse."  *AEB v. JBE*, 99-2668, p. 7 (La. 11/30/99), 752 So.2d 756, 761.  This discretion is given to the trial court as it is in a better position to assess witness credibility and "to ascertain the best interests of the child . . . given the unique set of circumstances involved in each case."  *Aucoin v. Weaver*, 20-364, p. 4 (La.App. 1 Cir. 11/6/20), 315 So.3d 296, 299.

In his first assignment of error, Mr. Simmons asserts that, based on the evidence and considering La.R.S. 9:335(A)(2)(b), "joint custody with equal sharing of visitation" should have been awarded.  He argues the trial court placed too much emphasis on Mr. Simmons's failure to pay any child support before having a court order and that Ms. Hodges's home with her new boyfriend is not stable.[4]  In his second assignment of error, Mr. Simmons asserts that the evidence clearly shows that the "feasibility" requirements of equal shared custody are met, thus it was error to not awarding equal custody.  Mr. Simmons's third assignment is not specifically addressed in the argument of his brief but appears to be the same as the other two assignments.

As in *Thomas v. Duhon*, 19-366, p. 3 (La.App. 3 Cir. 11/6/19), 283 So.3d 1077, 1080, "[a]lthough the parties may have previously agreed on a custodial

---

[4] We note that there was no evidence to this effect regarding Ms. Hodges's boyfriend.

arrangement, it is clear from the record that the parties were not in agreement as to custody at the time of the trial, and there was neither a prior stipulated or considered custody decree from the court." Thus, the case "involves an initial setting of custody" wherein "the primary consideration is the best interest of the child." *Id., see also* La.Civ.Code art. 131. The Louisiana Supreme Court emphasized this point in *Hodges v. Hodges*, 15-585, pp. 2-3 (La. 11/23/15), 181 So.3d 700, 702:

> The best interest of the child is the sole criterion to be met in making a custody award, as the trial court sits as a sort of fiduciary on behalf of the child and must pursue actively that course of conduct which will be of the greatest benefit to the child. *C.M.J. v. L.M.C.,* 14–1119 (La.10/15/14), 156 So.3d 16, 28, *quoting Turner v. Turner,* 455 So.2d 1374, 1378 (La.1984). It is the child's emotional, physical, material and social well-being and health that are the court's very purpose in child custody cases; the court must protect the child from the real possibility that the parents are engaged in a bitter, vengeful, and highly emotional conflict. *Id.* The legislature has mandated that the court look only to the child's interests so that the court can fulfill its obligations to the child. *Id.* at 28–29.

"Every child custody case must be viewed based on its own particular facts and relationships involved, with the goal of determining what is in the best interest of the child." *Joubert v. Joubert*, 19-349, p. 9 (La.App. 3 Cir. 11/13/19), 285 So.3d 7, 14.

Louisiana Civil Code article 134(A) provides a nonexclusive list of factors used in determining the best interest of the child:

> (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

> (2) The love, affection, and other emotional ties between each party and the child.

> (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

> (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties

(14) The responsibility for the care and rearing of the child previously exercised by each party.

Furthermore, La.R.S. 9:335(A)(1) states that "[i]n a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown." The implementation order shall allocate physical custody "so that the child is assured of frequent and continuing contact with both parents" and "[t]o the extent it is feasible and in the best interest of the child, physical custody should be shared equally." La.R.S. 9:335(A)(2). While La.R.S. 9:335 does not *mandate* equal sharing of physical custody, it does call for frequent and continuing contact with both parents while maintaining the best interest of the child

as the overriding consideration. *Beadle v. Beadle*, 20-264 (La.App. 1 Cir. 12/30/20), 318 So.3d 902. In *Beadle*, the first circuit noted that to implement a fifty-fifty arrangement, the evidence must show that such an arrangement is both feasible *and* in the best interest of the child. *Id*. "If both prongs are not met, then the court shall institute" an arrangement "that assure[s] each parent of 'frequent and continuing contact[.]'" *Id*. at 905. "Notwithstanding, the jurisprudence has further recognized that the implication of La.R.S. 9:335 is that most joint custody decrees will invariable result in children primarily residing with one parent more than the other." *Joubert*, 285 So.3d at 8.

The evidence in *Beadle* was a prime example of when equal shared custody was proper. In reversing the trial court to permit shared physical custody, the first circuit noted that both parents provide stable and loving homes, communicate well, and allow flexibility in the custody schedule when necessary. More specifically:

> In making its decision, the district court relied primarily on what the parties were doing in the interim as well as the district court's dislike for a two-two-three custody schedule, rather than considering the feasibility of the parties sharing equal physical custody of the children.
>
> . . . The Beadles are the exact type of family in which equal sharing of physical custody is best. Daniel and Amanda are both involved, loving parents who have flexible schedules, do not live too far apart, and already share physical custody of their older children. . . . There was no evidence presented to suggest that the children were struggling with consistency when Daniel exercised custody one night during the school week. In fact, the testimony revealed that the children were doing well. The record supports a determination that shared custody will have positive benefits for the children including frequent contact with both parents, as well as constant time with their older siblings as a family unit.

*Beadle*, 318 So.3d at 906.

Noting the standard of review and discretion given to a trial court in child custody matters, this court has also affirmed a shared physical custody implementation plan in *LeBlanc v. Welch*, 17-908 (La.App. 3 Cir. 3/21/18), 240

So.3d 291. In *LeBlanc*, this court found no clear showing of abuse of the trial court's discretion in awarding shared physical custody. The trial court implemented the following shared custody arrangement:

> During the school year: Father shall have the child every other Wednesday after school until Saturday morning at 10:00 a.m.; Mother shall have the child every other Saturday morning at 10:00 a.m. until Thursday morning when she drops the child off at school; Father shall have the child every other Thursday after school until Monday morning when he returns her to school; and Mother shall have the child every other Monday after school until Wednesday morning when she drops the child off at school.

*Id*. at 294. Considering both parties would have to rely on extended family for assistance with childcare and the trial court's encouragement for the parties to be flexible, this court affirmed the trial court's conclusion that shared physical custody was feasible. Additionally, both courts considered the best interest of the child and those factors listed in La.Civ.Code art. 134.

Here, the hearing testimony demonstrated that both parents love S.S and can care for S.S. Mr. Simmons testified that he had a flexible work schedule and lived within minutes of S.S.'s paternal grandmother, Pamela Simmons, who frequently cared for S.S. while the parties lived together. In fact, the parties spent most evenings at the grandmother's home, and she often cared for S.S. while the parties worked and S.S. was not in daycare full time. Mr. Simmons also agreed that Ms. Hodges is "a great mother."

One of Ms. Hodges's concerns regarding Mr. Simmons having custody was Mr. Simmons's alleged alcohol use. However, her main concern regarding equal custody was that she believes S.S. needs more consistency, especially when he outgrows daycare and begins school. Ms. Hodges further testified that Mr. Simmons did not contribute much to S.S.'s care when they were together, such as changing diapers or feeding S.S.

7

Pamela Simmons, the paternal grandmother, testified that after the parties' separation, she continued keeping S.S. on Tuesdays and Thursdays and that he went to daycare on Mondays, Wednesdays, and Fridays. She further testified that she never saw Mr. Simmons drunk while S.S. was in his presence. Mrs. Simmons explained that Mr. Simmons brings S.S. around every day when he has custody and that Mr. Simmons is with S.S. the entire time—he cares for him and never leaves him to "go off[.]" Mrs. Simmons also testified that Ms. Hodges has asked her to watch S.S. on days that are not during Mr. Simmons's weekends and, likewise, Ms. Hodges has accommodated Mrs. Simmons if she requests to see S.S. during times that are not Mr. Simmons's weekends.

Lastly, Ms. Hodges called Jacob and Angela McBride, Mr. Simmons's cousins, to testify on her behalf, mainly regarding Mr. Simmons's alcohol use. However, the trial court found this testimony to be vague and unreliable and, upon review, we agree.

In its reasons for judgment, the trial court summarized the evidence and trial testimony:

> The evidence is pretty clear to me that during the time that they lived together that the mother was the primary caretaker of this minor child. However, it is also evident to me that this child had a lot of contact with the father's family by the fact that they lived on the family property. They had frequent contact at the paternal grandparents' house. They basically ate almost every evening meal at the grandmother's house. . . .
>
> . . . .
>
> . . . They've been trying to work back and forth now for - - ever since April to try to figure out something to do with this child.
>
> And at some point . . . Mr. Simmons decided to file a petition for custody. That's not unusual. . . . But for whatever reason, it hurt the mother's feelings really bad whenever that happened. And during all of this Mr. Simmons had the child or picked the child up from daycare, kept the child for a couple of weeks, something like that, and then Miss

8

Hodges got the child back and the dad didn't get to see the child for about 74 days. And, you know, that's not really surprising to me either because in these types of situations . . . the way that it works is, is that whoever has the child, has the child until you go to court. . . . And sure, it's not fair, its not right, but it's just the way that it is because people can't be reasonable with one another in these types of proceedings. And you two were not reasonable with one another either. . . .

And so, now this is a situation of mom only wants to have alternating weekends, dad only wants to have a shared custody plan.

Well, I've heard the evidence. I've also taken into consideration the factors set forth in Code of Civil Procedure Article 134. You know, as far as those articles are concerned, both of these parties have love and affection and emotional ties between themselves and their baby. They both love this baby to death. They each have the ability to give the love, affection, spiritual guidance. They can each provide the child with food, clothing, medical care and other material needs. They make basically almost the same amounts of money and we'll get into that in just a minute. The length of time that the child has lived in a stable, adequate environment and the desire and ability of maintaining that environment; they both have good environments. I don't see anything wrong with the dad's environment. He has a close tie with his family and he sees them a lot. The mother now has a boyfriend who lives with her. He works 14 and 14. I haven't heard anything negative about the boyfriend. She's living in an apartment and the court takes into account that since these parties have separated, she's been working her butt off, two and three jobs to try and take care of this baby because she got zero help from daddy.

Both of these parties are basically morally fit. There is, on the mother's part, no history of substance abuse or criminal activity or anything like that. There is a little bit of evidence that the court heard today about the father possibly having a drinking problem. But I'll state for the record that these two that came in here and testified today, the McBrides, I give their testimony no credibility whatsoever. Their testimony was so vague. There was a family feud that took place in 2015. I can't believe a word those people said. I think they're good people, but they had an axe to grind and they grinded it.

I don't necessarily think that the alcohol situation here is really all that bad. I think that it was bad back in the early days of these parties relationship because they were young, he wanted to party, he wanted to drink and he did that. And he may be doing some of it now, but most of the evidence that I've heard is that this foolishness has been taking place outside the presence of the child.

They're both mentally and physically healthy. They're home, school and community history is all basically in the Rosepine and DeRidder area. . . .

9

. . . [T]he court is going to award joint custody of this minor child. I'm going to designate the mother as the primary custodial parent because she, as the court has already indicated, has been the primary caretaker of this minor child according to the evidence.

After considering the evidence and testimony, the trial court considered a joint shared custody plan, but ultimately provided reasons for why such a plan would not work:

Now, as far as what to do with the length of time that each of these parties spend with this child, we're gonna talk about this: in order for a joint shared custody arrangement to work, you two basically have to be on the same page. You have to be able to communicate. You have to be able to work out problems. You have to be able to agree to certain things. You have not been able to do that. You've not been able to agree on a custody arrangement or a visitation arrangement; neither one of you would bend an inch when it came to what you ultimately wanted.

And one of the arrangements or agreements that you did have is that you would help pay for half of the daycare, and that didn't happen. That's a breach of the agreement. In order for there to be joint shared custody, you have to work together. You have to make agreements. You have to stick to your agreements and do what you said you were going to do, and that didn't happen in this case.

I've got to have a situation where I can rely on a child going from a home to a home on a week to week basis where you two talk and have the same rules, have the same bedtimes, have the same plans on what's going to happen after school is over with homework and things of that nature, and to be able to accommodate one another. You two haven't really accommodated one another to any extent whatsoever that I can see because you've both had burrs up your saddles about what's happened with respect to the separation.

While the trial court found that, in this case, a shared plan was not feasible for these parties, it did award Mr. Simmons "more visitation than just the standard plan." The trial court ordered Mr. Simmons physical custody of S.S. on alternating weekends from Friday at 6:00 until Tuesday at 6:00 and explained, "I'm ordering that visitation on Mondays and Tuesdays because according to the testimony, he doesn't work" on those days.

Considering the jurisprudence, the best interest of the child factors, and the specific facts of this case as reiterated in the trial court's reasons, we cannot say the trial court abused its discretion in deciding against awarding equal custody in this case.

As far as child support is concerned, Mr. Simmons does not directly appeal the trial court's judgment. Instead, Mr. Simmons concludes his brief to this court with "it is submitted that the ruling the [sic] Trial Court should be modified, with the parties being awarded an equal sharing plan of custody, with the award of child support being re-calculated, accordingly." The trial court calculated the amount to be paid by Mr. Simmons to Ms. Hodges according to the basic child support obligation, and by concluding that Mr. Simmons earns 47% of the parties' gross monthly income. The trial court also added daycare expenses to the total obligation. In consideration of Mr. Simmons's visitation, the trial court allowed Mr. Simmons to have one month's worth of credit, thus reducing his overall obligation. Because we affirm the judgment, we do not recalculate the child support set forth therein.

**DECREE:**

For the foregoing reasons, the April 11, 2022 Judgment is affirmed. Costs of this appeal are assessed to Appellant, Caleb James Simmons.

**AFFIRMED.**